Appellant was convicted of murder in the first degree and sentenced to life imprisonment in the penitentiary. At arraignment attended by counsel appellant pleaded not guilty. At the time the sentence was imposed, appellant gave notice of appeal. He was found to be indigent and a free transcript was furnished him and trial counsel was appointed to represent him on appeal.
Appellant filed a motion to quash the indictment on the ground that he had been promised immunity from prosecution in exchange for his testimony against Danny Ray Miles who was also charged with murder in the first degree in the shooting death of Ronald Harvell White. Miles was convicted *Page 1214 
of murder in the first degree and sentenced to life imprisonment in the penitentiary. Miles appealed to this court and his case was affirmed on February 1, 1977 and certiorari was denied on April 1, 1977.
At the pretrial hearing on the motion to quash the indictment the voluntariness of a statement made by appellant was also considered by the trial judge.
The State and counsel for the appellant entered into a stipulation as follows:
"That on November 12, 1975, defendant testified as a witness for the State and that the defendant was not at that time nor at any prior time advised of his rights under Miranda, either by the Court or any officer."
At the hearing on the motion to quash the indictment the following testimony was developed:
 TESTIMONY OF ALBERT WALLACE
Wallace testified that he is a Sergeant in the Birmingham Police Department, assigned to homicide. He had been so employed for twenty-one (21) years. He began his investigation into the killing of Clarise Knabe on the morning of November 4, 1975.
Wallace testified that he came to know Samuel (Bud) Yarber on the morning of November 7, or November 8, 1975. Wallace stated he saw Yarber at the Birmingham City Jail at about 3:30 or 4:00 a.m. He further stated that he began questioning Yarber about this particular case in a confined office in the presence of approximately six other officers. Wallace stated that he purposely did not advise Yarber of his rights.
During this period of questioning of defendant by Wallace and approximately six other officers, the defendant was considered a suspect in the murder case. During this period of questioning the defendant related nothing regarding any happenings on the night of November 3 or November 4. He in fact denied knowledge of the robbery or murder or kidnapping. Wallace questioned the defendant in the presence of the other six officers for approximately 30 to 45 minutes. During this period of questioning the defendant seemed to possess his faculties but was very emotional and at times would cry. At the close of this 30 to 45 minute questioning period, all the officers but Wallace left the room. Wallace then talked with the defendant for a period of approximately 30 minutes. During this period of time the defendant made some statements to Wallace which led him to believe that the defendant had some knowledge of the happenings regarding the killing of Clarise Knabe. At the end of the 30 minute period involving Wallace and the defendant, Wallace left the room and informed the other officers that the defendant had indicated that he did not participate in the murder, but that he had knowledge of it, and he was not going to relate it to the officers unless they promised him that he would not be arrested. Wallace testified that shortly after making this statement to the other officers, the other officers agreed not to arrest the defendant. All the officers, at this point, returned to the room and each officer in each other's presence told the defendant that if he cooperated with them and gave them a story that they would each promise him that nothing would happen to him and that he would not be arrested or charged with any offenses arising out of this particular case. At this point the defendant stated that he desired to consult an attorney, but Wallace told him that he didn't think the defendant needed an attorney and that it was not necessary that the defendant call an attorney. The defendant gave the officers a statement.
Wallace testified that at the time the officers made their promise to the defendant that he would not be arrested or charged, that they did not have a case against Danny Ray Miles nor did they have a case against the defendant. Wallace stated that in his judgment as based on his experience as a Police Officer the defendant gave the officers his statement solely based on the promises that were made him by the officers. These promises were made *Page 1215 
on November 7 or November 8, 1975, were never withdrawn, and these promises were in effect when the defendant testified at the preliminary hearing of Danny Ray Miles on November 12, 1975. Wallace testified that prior to testifying at the preliminary hearing the defendant was purposely not advised of his rights for the sole reason that the officers thought that if he was advised of his rights he would not testify. Wallace stated that the defendant never withdrew from his agreement with the officers. The defendant was arrested subsequent to testifying at the preliminary hearing.
 CROSS-EXAMINATION
Wallace testified that he had talked to Danny Miles prior to talking to the defendant in that Miles had given him no information concerning the homicide. Wallace had received information from a woman who lived with Danny Miles that Miles and the defendant had been together on November 3, 1975. Wallace stated that at the time the defendant was brought in for questioning he was a suspect and that he did not advise the defendant of his Constitutional rights nor did any other officers in his presence advise the defendant of his rights.
Wallace stated that before the promises were made to the defendant by the officers that Yarber indicated to Wallace that he was with Miles on the night in question. Wallace testified that the defendant kept telling him that he was afraid of Danny Miles and that he was afraid he would be killed. Wallace assured him that if he told the truth and that if he was not involved he would be protected. Wallace testified that none of the officers qualified his agreement with the defendant on the basis that he did not have the authority to grant immunity.
In the statement given to the officers the defendant stated that he did, in fact, observe everything that had happened from the beginning to the end and that he was there as an unwilling party. After having made his statement to the officers he was no longer a suspect.
 REDIRECT EXAMINATION
Wallace testified that the reason the defendant was not a suspect was because he had cooperated with the officers. The defendant remained a suspect up until the point that he gave a statement to the officers and cooperated with the officers as a result of the promises made to him by the officers. Wallace testified that in his judgment the defendant relied on the promises given him when he gave his statement to the officers and when he testified at the preliminary hearing.
 RECROSS-EXAMINATION
Wallace testified that it was the defendant's version of what happened rather than the fact that he told the officers anything that removed him as a suspect in the case.
 REDIRECT EXAMINATION
Wallace testified that it was a combination of the defendant's cooperation and the substance of his statement that removed him as a suspect.
 TESTIMONY OF JAMES EARL SMITH
Mr. Smith testified that he was a Sergeant with the Jefferson County Sheriff's Office and had been so employed for twenty-two (22) years.
As a result of Smith's investigation, Danny Miles and the defendant were arrested. The defendant was arrested after Smith had received information that the defendant had been in the company of Danny Miles on the evening of November 3 or 4, 1975. At the time the defendant was arrested, he was a suspect in the case. Smith and Sergeant Paul Couch of the Sheriff's Office personally arrested the defendant. Prior to arresting the defendant Smith and Couch decided that they would not give the defendant the Miranda warning because they did not want him to freeze up and not say anything. Smith and Couch did pick up the defendant and did not advise him of his rights. The defendant was taken to the Birmingham City Hall and carried to an office inside the building where Officers *Page 1216 
Smith, Couch, Hurst, Wallace, Gillespie, and a Mr. Brad Morris were present.
At this time Officers Hurst and Couch played the role of the "bad guys" and Officer Wallace played the role of the "good guy." After about 30 minutes of this type of questioning Officer Wallace suggested that the other officers leave and allow him to talk to the defendant alone. After a period of about 15 minutes, Officer Wallace came out of the office and made a statement to the other officers, both as a group and then individually. Wallace told Smith and the other officers that the defendant would tell the whole story if they would guarantee him that he would not be arrested. All of the officers guaranteed that they would not arrest him and each officer individually conveyed this agreement to the defendant.
It was Smith's judgment that defendant relied on the promises that were made to him by the officers in giving a statement to the officers. At the time he made the statement to the officers he was a suspect. There was some conversation among the officers regarding arresting the defendant as a material witness and placing him under bond so that he would not leave the State. This plan was abandoned by the officers because they were afraid that they would "scare the defendant off." It was then decided that they would leave an officer with the defendant for his own protection. The main reason for putting an officer with the defendant was not for his protection but to insure his availability as a witness for the State. While an officer was with the defendant, the defendant was not free to leave.
Smith testified that he did not withdraw any promises made to the defendant nor did any other officers or any member of the District Attorney's Office in his presence or to his knowledge withdraw any of the promises that were made to the defendant on November 7 or 8, 1975. Smith further stated that it was his judgment that the defendant testified on November 12 or 13, at a preliminary hearing, because of the promises that were made to him giving him immunity. Smith stated that the defendant carried through with his part of the agreement; that the defendant was not arrested for the sole reason that the officers had promised not to arrest him in return for his cooperation and testimony.
 CROSS-EXAMINATION
Smith reiterated that Officer Wallace after talking to the defendant alone came out and told the other officers that if they would promise not to arrest the defendant that he would tell them the whole story. After the defendant gave the officers his statement he still remained a suspect and has continued to remain a suspect.
In substance the statement that the defendant made to the officers was that he was there, he saw what happened, that he was a hostage while it was taking place, and that Danny Miles did everything. Smith testified that he believed the defendant's statement and he felt that the defendant was more of a witness than a suspect after having given the officers this statement. Smith further stated that if the defendant testified to the same thing in court that he told the officers after the promises were made to him then he would not be a suspect.
Smith stated that they put an officer with the defendant because they felt that, if he was going to be solely a witness for the State, then they couldn't have gotten him back if he fled the State.
 REDIRECT EXAMINATION
Had the defendant not taken the stand and testified at the preliminary hearing he would not have been arrested as an accomplice to the crime but he would have remained a suspect. The defendant was not advised prior to giving his testimony that the agreements and promises had been withdrawn. The defendant was arrested subsequent to his testifying in court and that was not part of the agreement made between the officers and the defendant. *Page 1217 
 RECROSS-EXAMINATION
Danny Miles testified at the preliminary hearing when the defendant was arrested in court by Sergeant H.H. Brooks.
At this point the defendant rested regarding the motion to quash the indictment when the State called their first witness regarding this motion.
 TESTIMONY OF PAUL HURST
Hurst testified that he was a Detective-Sergeant with the City of Birmingham and worked in the robbery division. He investigated the robbery that occurred at the Twin Dolphin Lounge and was present during the interrogation of the defendant. Neither Hurst nor anybody in his presence advised the defendant of his Constitutional rights. After Officer Wallace had a private conversation with the defendant, Officer Wallace came to the other officers and made a statement to them that, if they would take Danny Miles from the building and if they would agree not to arrest him, that he would give the officers a statement. Hurst stated that Officer Gillespie told the defendant that he would not arrest him but that he couldn't say what the court would do. Hurst said that it was his understanding that he would not personally arrest the defendant, but that he never told the defendant that he would never be prosecuted by anybody at any time.
 CROSS-EXAMINATION
Hurst testified that he and the other officers present in the room identified themselves to the defendant as being either with the City of Birmingham, Sheriff's Department, or District Attorney's Office. Brad Morris was present with the other officers and he identified himself as being with the District Attorney's Office and said on that occasion Morris entered into a promise with the defendant. It was Hurst's intention that the defendant would not be charged with any offense arising out of the case that was being investigated and that was his intent when he made his promise to the defendant. Hurst recalled Sergeant Gillespie making some phone calls to his superiors before making his promise to the defendant and that Sergeant Gillespie called Dan Reynolds of the District Attorney's Office for the Bessemer Division of Jefferson County and Major Orange who is the assistant to the Sheriff of Jefferson County. Gillespie also called a Captain Williams who is with the Sheriff's Department in Jefferson County. After having made these three phone calls Gillespie entered into the promise made to the defendant.
Hurst admitted having testified at the preliminary hearing of Danny Miles that he was present when a statement was made to the defendant by one of the other officers present that if the defendant would make a statement about the events of the night of the killing he would neither be arrested or charged, and further testified that he concurred in the agreement.
 TESTIMONY OF SERGEANT C.C. GILLESPIE
Gillespie testified that he was a Detective-Sergeant for the Jefferson County Sheriff's Department and participated in the investigation of the deaths of Clarise Knabe and Ronald White and the robbery of those two individuals. He was present and participated in the interrogation and conversation with the defendant during the early morning hours of November 8, 1975. Neither he nor any other officers in his presence advised the defendant of his right to remain silent or right to an attorney. After Sergeant Wallace had a private conversation with the defendant, Wallace came out and told the group of officers that the defendant had indicated that he would talk to all of them in a group if they would listen to his story that he had to tell and if they believed his story they would give him their word that they would not arrest him. Gillespie agreed with this but with reservations stating to the officers that he would have to confer with his superior before he could enter into such an agreement with the defendant. Gillespie called Captain J.C. Williams and Dan Reynolds and returned to the room where the defendant was and told the defendant that he would enter into *Page 1218 
this agreement if the officers believed his story and also told the defendant that as far as he knew nobody in the State of Alabama but a legal body could give him immunity and not to expect that he was getting immunity from the Sheriff's Office but that he personally or that he as a representative from the Sheriff's Office would not arrest him.
 CROSS-EXAMINATION
Brad Morris of the District Attorney's Office was present when this agreement was entered into with the defendant. It was Gillespie's intent in making a promise to the defendant that the defendant would cooperate with the officers in giving them a statement and testifying and in return would be discharged after the case was over.
 REDIRECT EXAMINATION
Brad Morris works out of the District Attorney's Office in Birmingham Division and not in the Bessemer Division.
 TESTIMONY OF DAVID B. "BRAD" MORRIS
Morris testified that he was employed by the Jefferson County District Attorney's Office and that he worked under Mr. Earl Morgan who is the District Attorney of the Tenth Judicial Circuit. Morris was present on November 8, 1975, at an interrogation or conversation with the defendant. As best he could recall, Wallace, after having talked privately with the defendant, made a statement to the officers that if the defendant made a statement to the officers and if they believed his statement, they would not arrest him; that each of the officers verified his promise to the defendant and that Gillespie made a statement like, "That's only as here, I can't tell you what someone else might do." The defendant then gave the officers his statement.
 CROSS-EXAMINATION
Morris recalled testifying at the preliminary hearing of Danny Miles on the 12th or 13th of November, 1975. At the time the defendant was being questioned and at the time the defendant made his statement to the officers there were representatives present from the Sheriff's Department, the City of Birmingham Police Department, and the District Attorney's Office. Morris testified at the preliminary hearing that he agreed with the other officers that the defendant would not be arrested or charged. This promise made to the defendant was agreed to by all the officers present. At no time during the preliminary hearing did Morris tell the attorney for Mr. Miles, Judge Montgomery, or the District Attorney that a qualification was made in regard to that promise. It was Morris's intent that when he made this promise to the defendant that the defendant would not be charged or tried for the offenses of murder, robbery, or kidnapping resulting in the deaths of Knabe and White after the promises were made to the defendant.
 REDIRECT EXAMINATION
At the time Morris made the promise to the defendant he did not know what the defendant was going to say.
 RECROSS-EXAMINATION
In regard to what the defendant would tell them Morris trusted and relied on the judgment and twenty-one (21) years experience of Officer Wallace.
At this point the State informed that court that they had no further witnesses. The defendant informed the court that the defendant and the State had stipulated that there were three people who testified at the Grand Jury that indicted the defendant of the murder regarding the death of Clarise Knabe; that the three people were Gillespie, Helton and Galbar; that Galbar testified to what he heard in the courtroom at the preliminary hearing of Danny Ray Miles including the testimony of both Miles and Yarber; that Helton testified to the crime scene and having known Clarise Knabe; that Gillespie testified to the crime scene and the statement received from the defendant and possibly to some other items *Page 1219 
which might have been found either at the defendant's apartment or at the scene itself.
Following argument to the court by both the defendant and the State, the court made the following ruling:
The court found that the statement made by the defendant was involuntarily given due to the promises made to the defendant by the officers. The court granted the motion to suppress the confession. The court denied the motion to quash the indictment and in support thereof stated, "No officer can promise or give immunity for prosecution for murder and deprive the people of the State of the right to try anyone found to be or in a situation where they are charged with either murder or any other crime."
The case proceeded to trial on its merits and the following testimony was presented by the State.
Gus Konstant testified that he was an owner and operator of a nightclub known as the 2010 Lounge or the Twin Dolphin on November 3, 1975. A woman by the name of Clarise Knabe worked for Konstant at the lounge from 4:30 until 12 o'clock at night as Konstant's Bar Manager and Bartender.
On November 3, 1975, at about 11:00 p.m. Konstant was at his home. At approximately 11 o'clock that night Konstant left his home to go to his place of business located at 2010 5th Avenue, North, in Birmingham. He arrived at the lounge at approximately ten minutes after 11:00. Konstant parked his car in front of the lounge and went to the front door. He found the front door locked on the inside. He yelled for Clarise through the crack of the door, rapped on the window with the key, and looked in the window. He could see that the TV was on in the lounge but he could see no people in the bar. Konstant then went back and rapped on the door again. He then went to the rear of the lounge.
Konstant entered the lounge through the back door. He observed the cash register and cash box lying on top of the register. Konstant went to the end of the counter where he saw two wallets and two beers, one wallet being in the middle of the counter and the other at the opposite end of the counter. Looking behind the counter Konstant saw Clarise's pocketbook on the floor and some cigarettes on the floor. The cigarettes were usually kept under the counter behind the bar. Konstant noticed three drinks in the lounge, two beers and a glass at the end of the counter. Konstant testified that he ran out of the lounge and into the Molton Hotel screaming. Konstant stated that he had the people in the hotel call the police. He went back out to the parking lot and waited until the police arrived at which time he went back into the lounge with two officers. At this time he noticed that there was ice in a cocktail glass, and a cold beer was on each side of the cocktail glass.
 CROSS-EXAMINATION
Before the third day of November, 1975, Konstant knew a Danny Ray Miles and had had some dealing with him. Prior to November 3, 1975, Konstant had never seen the defendant nor had he ever talked with him.
Oliver Clark testified that while traveling east on Highway 50, on November 4, 1975, he found two dead people off the road next to Shades Creek. Clark observed a man and a woman close to the edge of the creek with no clothing on. Clark observed the bodies at a distance of four or five feet for approximately two or three minutes. During this time he detected no movement. Clark then went to a grocery store and called the Highway Patrol. A Highway Patrolman by the name of Wallace met Clark at the grocery store, and Clark showed him the location of the bodies.
Jim Wallace testified that he was employed as a State Trooper for the State of Alabama and was so employed in the early morning hours of November 4, 1975. He met a Mr. Clark on the morning of November 4, 1975, and Mr. Clark took him to the location of two dead bodies. No one in *Page 1220 
Wallace's presence moved the bodies or disturbed them in any way and he observed no signs of life in the bodies. Wallace blocked the road going down to the creek with his patrol car.
J.P. Helton testified that he was a Deputy Coroner for Jefferson County and had been so employed for approximately eight years. He was working in this capacity in the early morning hours of November 8, 1975. Helton arrived at the scene of the two dead bodies and identified the woman as Clarise Knabe. Helton had known the woman when she was an employee of the Fairfield VFW Club. He examined the bodies and determined that both bodies were dead. Helton found multiple gunshot wounds on both bodies. He was present at an autopsy performed by Jay Glass on the body of Clarise Knabe. Helton show the State Exhibit # 1 and identified it as a true, accurate picture depicting the scene where the bodies were found as it existed when he arrived. He identified the female in the picture as being Clarise Knabe.
Jay Glass testified that he is presently employed as a Pathologist's Assistant and Deputy Coroner and was so employed on November 4, 1975. Glass made an examination of the bodies at the location where they were found in order to determine the time of the death. From his examination he determined that death occurred between midnight and 4:00 a.m. and possibly as much as two hours before midnight but not very much after 4:00 a.m. Glass performed an autopsy on the female body that day. His autopsy revealed the death was due to multiple penetrating and perforating gunshot wounds in the chest, back, abdomen and the head. Glass removed several bullets from the female body, and as he removed them, he gave them to Coroner Helton. Sergeant David Higgins of the Birmingham Police Department was also present at the autopsy.
Glass also performed the examination of the body of the male victim and determined that he also had been shot.
Based on his examination Glass determined the cause of death was due to multiple penetrating perforating gunshot wounds in the chest, back, abdomen and the head with exsanguination or bleeding to death and with the shock that accompanied it.
Danny Ray Miles was at the time of giving his testimony charged in the Bessemer Division of Jefferson County with murder of Clarise Knabe and Ronald Harvell White. Miles at the time of giving his testimony was charged in the Birmingham Division with the robbery of both of these persons. Miles had discussed his right not to give testimony with his attorney. Miles understood that regardless of his testifying the State of Alabama would prosecute him for all of those offenses.
Prior to his testimony in court Miles had not had a conversation with the District Attorney or any other law enforcement officer. He knew the defendant and had known him for the last year. Miles came to know the defendant while they both were living at the Summit House Apartments. Miles first saw the defendant on the third day of November, 1975, at the defendant's apartment. At approximately 5:30 or 6 o'clock that evening they left the defendant's apartment and went to a nightclub in the downtown Birmingham area. Miles and the defendant spent approximately an hour and a half at the Cabana Hotel Lounge drinking beer. From the Cabana Miles and defendant went to another lounge in the Birmingham area and stayed there for approximately another hour. At this lounge Miles and the defendant talked to the bartender. From this lounge Miles and the defendant went to a K-Mart Department Store on Green Springs Highway in the Birmingham area. The defendant drove the car from the lounge to the department store. Miles and the defendant went to the sporting goods department where Miles purchased a box of .38 caliber shells. Miles obtained the money to purchase some bullets from the defendant. From the K-Mart Department Store, Miles and the defendant returned to the defendant's apartment and both Miles and defendant entered the defendant's apartment. *Page 1221 
While Miles was using the defendant's bathroom he heard a shot. Miles came out of the bathroom and observed powder burns on the defendant's hands.
Miles left the defendant's apartment and went down to his car. Miles and the defendant got in Miles's car and went to the 2010 or Twin Dolphin Lounge. They parked in the rear parking lot and went into the lounge using the rear entrance. They sat at the first two stools at the bar coming in the rear door and drank beer and played the electronic baseball machine. They arrived at the lounge at approximately 9:30 or quarter to 10:00 that night. Miles testified that there was a big screen TV in the lounge and that eventually they moved to the other end of the bar and watched the TV. It was a Monday night and the Monday football game was on the TV. There was a woman with reddish-auburn hair about middle aged tending the bar. Miles asked the woman tending bar what time Gus was coming in.
When the football game ended, everyone left the lounge, except Miles, the defendant, the barmaid and another man that had been sitting between Miles and the defendant. As soon as the last person had left the lounge, the defendant jumped up, pulled out a pistol and said, "This is a holdup." At this point Miles and the other man sitting at the bar jumped up and raised their hands. The defendant had said nothing to Miles about what was going to happen or what he was going to do. The barmaid did not respond to the defendant's statements. The defendant at this point fired a shot. The defendant started walking back toward the rear entrance and got behind the bar with the barmaid. The defendant then told him to put his hands down and to go lock the front door.
After Miles locked the front door the barmaid handed the money out of the cash register to the defendant. The defendant then told the barmaid to empty her purse on the floor and Miles further testified that the defendant kicked through the items that were emptied from the barmaid's purse. The defendant then began looking through the man's wallet. About this time there was a knock at the front door and the defendant told them to go out the back door and the barmaid, the man, Miles and the defendant went out the back of the lounge.
They left in Miles's car with Miles driving. The defendant was in the right front seat and the barmaid was riding in the left rear and the other man in the right rear. The defendant told Miles to get on the Super State and head toward Montgomery. Miles turned right at the intersection of Highway 31 and Highway 150 heading toward Bessemer. The defendant then told Miles that they were going to go to a place where they had sighted their rifles for deer shooting. Miles backed the car down a dirt road off Highway 150. At this point the barmaid was in the front seat of the car. At this point the barmaid and the man had removed their clothes.
After parking the car the defendant and the woman got out of the car and were standing to the right of the car when the defendant asked Miles for the bottle of Chivas Regal Scotch. Miles handed the bottle of Scotch to the defendant. Miles, the defendant, the barmaid, and the man all had a drink of the Scotch. The man was in the back seat with his hands over his head. Miles testified that while traveling from the lounge to where the automobile was parked he made the following statement to the defendant: "I told him I couldn't believe we were doing it." The defendant replied, "I am going to give them a long walk home." The defendant kept asking the barmaid and the man what they were going to say.
Miles testified that the defendant and the barmaid were at the rear of the car for approximately 15 minutes. Miles did not look back to see what the defendant and the barmaid were doing. He only heard them talking. He further testified that he never started or cranked up the car.
The defendant walked up to the rear of the car with the barmaid and told the man to get out of the car. The man got out of the car and the defendant told the man to go over and lie down with the barmaid who *Page 1222 
was already lying on the ground to the right of the car approximately 15 feet away. Miles at this point slid from the driver's side to the passenger's side of the car to observe what the defendant was doing.
The defendant was within a couple of feet of the car and turned and pointed a pistol toward the barmaid and the man. At this point Miles grabbed his arm and asked the defendant what he was going to do. The defendant kept saying that he had to do it. When Miles let the defendant's arm go, he started firing shots at the people. The defendant began walking closer to the people while still firing the pistol. Miles observed the defendant reload the gun and continue firing the pistol. Miles testified that he did not know how many shots were fired but that the defendant reloaded the gun several times. After the shooting stopped, the defendant got back in the car on the driver's side and drove the car back up Highway 150 heading toward Highway 31.
The clothes of both the barmaid and the man were in the car when Miles and the defendant left the scene. The defendant told Miles to get the clothes out of the back seat. Miles got the clothes and he and the defendant began throwing the clothing out of the car.
At a truck stop near Leeds the defendant gave Miles some money that he had gotten back at the 2010 Lounge.
After having thrown the clothes out of the automobile the defendant stopped the car at a body of water, and the defendant threw the pistol into the water. From there the defendant drove to a post office where he said he had a post office box. From the post office box the defendant drove to a truck stop and the defendant got out and went inside. Miles testified that he observed police officers at the truck stop. After approximately five or ten minutes the defendant came back to the car with coffee and cigarettes. From there he drove back to his apartment. Miles went into the defendant's apartment and stayed approximately five minutes. Inside the apartment the defendant looked at the hole that was made when he fired the pistol earlier. The defendant then went to his bedroom and returned with some sort of a wall patch and patched over the hole. The defendant then called Miles into the kitchen and told him to trickle a box of soap onto his hands. After leaving the defendant's apartment Miles went home.
On the night of November 7, 1975, Miles was arrested by the police at the P.J. Lounge. Miles was taken to the City Hall by the police and there asked about the events of the night of November 3, and the morning of November 4. Miles told them that he would not talk to them until he had talked with an attorney. Miles related his story about the events of November 3 and the morning of November 4 for the first time when he testified at his preliminary hearing in Birmingham.
Alma Vest testified that on the third day of November, 1975, she went with Flavius Coleman to the 2010 Lounge in Birmingham. They arrived at the lounge at approximately 9:30 p.m., and when they arrived at the lounge, there were approximately seven or eight people in the lounge. Vest and Coleman sat to the right of the bar at a table. Vest saw Miles in the bar and saw him walk to the end of the bar and sit down next to a man by the name of Ronnie White. Vest knew White from working with him at the post office. Vest identified the defendant as a man sitting on White's left at the bar. Vest and Coleman left the lounge at ten minutes till 11:00 or 11:00 p.m. At the time that Vest and Coleman left the lounge the defendant, Miles, the bartender and Ronnie White were still in the lounge.
Vest testified that she had seen the defendant before, but did not know him personally. Vest saw the defendant at the preliminary hearing and recognized him at that time.
Vest further testified that she arrived at the lounge at approximately 9:30 and that she and her male companion were drinking. Vest and Coleman were sitting at a booth toward the front of the lounge and Vest *Page 1223 
was sitting facing the side of the lounge with her side toward the back of the lounge. Vest described the booth in which they sat as being against the east wall. She further testified that there was a partition along the east wall separating the area of the booths from the area of the bar and that there is also a partition that goes right down the center of the lounge.
David Higgins testified that he was a Sergeant in the Birmingham Police Department and was currently in charge of the Evidence Collection Unit, Scientific Investigation Bureau and was working in that capacity on November 4, 1975. On November 4, 1975, Higgins went to a location near Highway 150 and Shades Creek, where two dead bodies were found. Higgins was present at an autopsy performed on one of the persons found at the scene. During the course of the autopsy, Higgins observed projectiles being taken from the body and given to Deputy Coroner Helton. Helton logged and marked the projectiles in his record and then gave them to Higgins. Higgins identified a bullet marked State Exhibit # 2. Higgins testified that he received this particular projectile from an Officer Crocker. Higgins next identified a projectile marked State Exhibit # 3 and testified that he had received this particular projectile from an Officer Guyer.
Higgins identified State Exhibits # 4, # 5, # 6, and # 7 as being those projectiles that were received from the body of the female. Higgins was asked if he had an opinion regarding whether or not these projectiles were fired from the same gun. In response he testified, "Yes, sir, in my opinion all five were fired from the same weapon." Higgins made a comparison of the bullet received from Officer Guyer with the "five bullets" he recovered from the body of the deceased. Higgins was then asked if he had an opinion regarding whether or not the bullet received from Officer Guyer was fired from the same gun as the "five bullets." Higgins further testified that the projectile received from Officer Guyer was also fired from the same gun. Higgins made a comparison of the projectile he received from Officer Crocker with the "five bullets" he received from the deceased. Higgins was then asked if he had an opinion regarding whether or not that projectile was fired from the same weapon as the projectiles he received from the body of the deceased. Higgins stated that in his opinion the bullet received from Officer Crocker was fired from the same weapon that fired the other bullets.
On cross-examination Higgins testified that he received the bullet referred to as Exhibit # 3, from Officer Guyer on the fourth day of November at 5:46 p.m. This particular bullet was in Higgins' possession from that time up until the couple of minutes before he walked into the courtroom at which time he gave the bullet to Dan Reynolds. Higgins did not have a bullet in his possession until it was given back to him some time later in the courtroom by Dan Reynolds.
A projectile referred to as Exhibit # 2 given to Higgins by Officer Crocker on November 10, at 12:43 was obtained by Officer Crocker "from an apartment over the mountain." Higgins was not present when this projectile was obtained.
Higgins received projectiles referred to as Exhibits # 4, # 5, # 6, and # 7, on November 4, 1975. Higgins testified that he did not recall leaving a room while the autopsy was being performed. The projectiles were received by Deputy Coroner Helton and placed in a container. Helton's initials were placed on them and then they were given to Higgins.
At this point the defendant asked the court to remove the projectiles referred to as Exhibits # 2 and # 3 and rule them inadmissible as evidence. In response the State called the following witness.
Richard Keith Crocker testified that he was a Police Officer with the City of Birmingham and worked in the Technical Service Division as a Technician. On November 9, 1975, while working in this capacity, Crocker had an occasion to go to 1146 16th Avenue, South, Apartment D. Crocker was directed to go to this location by his superior, Sergeant Higgins. This apartment *Page 1224 
belonged to the defendant and the defendant was aware that Crocker was coming and let Crocker into his apartment. Crocker recovered a projectile from a hole found in the defendant's apartment. Crocker identified the projectile referred to and marked as State Exhibit # 2 as being that projectile that he recovered from the defendant's apartment. Crocker kept this projectile in his possession until it was turned over to Higgins on November 10, 1975 at 12:43.
On cross-examination Crocker testified that he did not advise the defendant of his rights before he entered the defendant's apartment, nor did he have a search warrant at the time he entered the defendant's apartment. Crocker said that he was not present on the morning of November 8, when the defendant was questioned and he knew nothing of the circumstances or events surrounding any statement or admission made by the defendant.
Officer Gillespie was called for further cross-examination and testified that he was the head officer or primary officer involved in the investigation of the Knabe killing. As a result of the statement made by the defendant on the morning of November 8, 1975, to Gillespie and the five other officers certain facts were ascertained from the defendant regarding the incident under investigation. Gillespie did not instruct an Evidence Technician to go to the defendant's apartment to remove a projectile from the wall but did think that Sergeant Smith was responsible for having done this. Gillespie testified that the only way the officers received information about the bullet in the defendant's wall was from the statement that the defendant made to them. As a result of this information received by the way of the defendant's statement someone was sent to the defendant's apartment to recover a bullet out of the defendant's wall.
Sergeant Hurst was called for further cross-examination and testified that he was one of the six officers involved in taking a statement from the defendant on the morning of November 8. As a result of the statement made by the defendant the officers received information regarding the projectile in the wall of the defendant's apartment. Hurst did not instruct an Evidence Technician to go to the defendant's apartment and recover the projectile, however one of the six officers present at the statement made by the defendant conveyed this information to the Evidence Technician Department and in turn the department sent a Technician to the defendant's apartment to recover the projectile. The statement made by the defendant was the only means of evidence ascertaining the fact that a projectile was in the wall of the defendant's apartment.
Following the testimony of Hurst the defendant and the State argued the admissibility of the projectile referred to and marked as State Exhibit # 2. The court having heard the argument presented by defendant and the State overruled the defendant's objection to the admissibility of the projectile marked as State's Exhibit # 2.
 TESTIMONY OF DAVID L. HIGGINS RECALLED FOR FURTHER EXAMINATION BY THE STATE
This time the State offered in evidence those projectiles marked as State's Exhibits # 4, # 5, # 6 and # 7. The aforementioned exhibits were allowed in by the court over the objection of the defendant.
Daniel K. Guyer testified that he was a Police Officer for the City of Birmingham and worked in the department as an Evidence Technician. Guyer was working in this capacity the night of November 3 and the early morning hours of November 4, 1975. Guyer arrived at the 2010 Lounge or Twin Dolphin Lounge at 11:55 on the night of November 3, 1975. Guyer went inside the lounge and began to process glasses, bottles, several different articles and also took pictures. Upon an investigation of a hole in the west wall of the lounge, Guyer found what appeared to be a spent bullet. Guyer collected the bullet, and, having not marked the bullet in any form or fashion, kept the bullet in his possession up until the time that he personally handed the bullet to Sergeant Higgins. An envelope was marked *Page 1225 
as State's Exhibit # 3-A and Guyer was allowed to identify the envelope over the objection of the defendant. Guyer testified that the envelope stated the time and location where he found the contents of the envelope, the contents being a spent bullet. After collecting the spent bullet, Guyer testified that he put it in the envelope and sealed the envelope. Guyer further stated that the envelope was sealed at the time he presented it to Sergeant Higgins.
 CROSS-EXAMINATION
Guyer could not say that the bullet that he took out of the west wall at the 2010 Lounge and put in the envelope marked State's Exhibit # 3-A was in fact the same bullet that was in the courtroom and marked State's Exhibit # 3.
Guyer lifted eleven fingerprints. Guyer first processed two glasses, one clear and one frosted, on a table in front of the lounge by the bar. Guyer was able to lift prints from the clear glass that was on the table. As best he could remember, both glasses had liquid in them.
Guyer then processed a glass and a Budweiser beer bottle located on top of the bar close to the west wall. Prints were lifted from both bottle and glass. A billfold on the bar was processed, however, no print was lifted from the billfold. Another clear glass was located in the middle of that portion of the bar that runs from east to west. No prints were lifted from this particular glass. Three prints were lifted from a glass located at the southeast corner of the bar. A Budweiser beer bottle next to this glass was processed, however, no prints were lifted from this bottle. A print was taken off of an unopened pint bottle of Smirnoff Vodka that was lying on the floor behind the bar at the south end of the bar. Another print was lifted from a black patent leather purse lying on the floor behind the bar. The cash register was processed, however, no prints were lifted. The door handles of both the front and back doors were processed, however, no prints were lifted.
Guyer took the prints that he had lifted and sealed them up in an envelope, put them in a locked container box at the City Hall. To the best of Guyer's knowledge, the prints went from there to the City ID Bureau for processing. Each print was marked with an identifiable number.
 REDIRECT EXAMINATION
The State offered into evidence the State's Exhibit # 3 consisting of a projectile and Exhibit # 3-A consisting of an envelope. The defendant objected separately and severally to the introduction of these items, stating that the projectile was not identified by Guyer though he did identify the envelope. The court stated, "Sustained. Did that envelope and projectile come in here together?" The defendant asked the court to go into the matter outside the presence of the jury and the court stated: "I'll rule on that in the morning," and the jury was dismissed for the day.
Upon reconvening out of the presence of the jury the court reversed an earlier ruling that allowed into evidence a bullet taken from the defendant's apartment, State's Exhibit # 2, now ruling that this bullet was inadmissible into evidence. The court allowed into evidence the State's Exhibit # 3 being that projectile taken from the 2010 Lounge and State's Exhibit # 3-A being the envelope that Officer Guyer had put this projectile in. The defendant excepted to the court's ruling.
Guyer testified that he lifted some prints from a 1969 Ford automobile during his investigation of this case. This automobile belonged to Danny Ray Miles.
There were twelve seats at the bar area, nine of which were on the side of the bar running north and south and three of which were at the south end of the bar area running east and west.
Guyer processed five Pabst Blue Ribbon cans located on the right front seat floorboard of the 1969 Ford automobile and was able to lift two prints from these beer cans.
Defendant offered defendant's Exhibit # 1 consisting of a diagram of the lounge *Page 1226 
that Officer Guyer had drawn with the exception of certain writing on the drawing on the grounds that the writing did not deal with the drawing itself. The State offered no objection, but asked the court if they could ask Mr. Guyer questions on voir dire concerning the writing on the drawing.
On voir dire examination, Guyer stated that he made the drawing and that all marking, writing, numerals, and designs were put on the drawing by him. The court allowed the entire drawing into evidence and the defendant excepted.
Sandra Triplett testified that she was employed by the Birmingham Police Department and worked as a Fingerprint Technician in the Identification Bureau. The State asked Triplett if she had an occasion to participate in the investigation into a kidnapping and robbery and at this point the defendant objected to the question. The court overruled and the defendant excepted. Triplett testified that she did participate in the investigation and made fingerprint comparisons in the kidnapping and robbery case.
Triplett testified that she received latent prints from a locked depository in her office. She received the prints in two separate packages and the packages shown her by the State are the packages that she received. During the investigation she received the known prints of the defendant and compared the latent prints with the known prints of the defendant. She was unable to make any identification of the latent prints with the known prints of the defendant.
Triplett received known prints of Danny Miles and upon making a comparison of these prints with the latent prints she received, she was able to make an identification on two of the latent prints.
The latent prints were received in two packages, one package with eleven lifts and the other package with 17 lifts. Of the eleven prints she was only able to identify two as being those of Danny Miles.
In short, this witness testified that none of the latent prints turned over to her were identified as belonging to defendant.
James T. Birdieshaw testified that he knew the defendant and had known him a little over a year. Birdieshaw knew the defendant as a friend. Birdieshaw also had known Danny Miles a little over a year.
Birdieshaw recalled seeing the defendant and Miles together on November 3, 1975. Birdieshaw testified that he believed he heard Miles say that they were going to Terry's Lounge that evening. Birdieshaw saw the defendant on Tuesday and Wednesday and Thursday.
 CROSS-EXAMINATION
Birdieshaw testified that he knew Miles' reputation in the community where he lived, and that his reputation was bad. He further stated that he knew Miles's reputation for peace and quiet in the community and that Miles' reputation was that he was a violent type individual. Birdieshaw further stated that he knew Miles' reputation for truth and veracity in the community and that his reputation for truth and veracity was bad. Birdieshaw further testified that he would not believe Miles in a court of law under oath.
 REDIRECT EXAMINATION
Birdieshaw stated the defendant and Miles lived in the same apartment complex and that he had seen them together on many occasions. He further testified that the defendant and Miles had been places together and that he had been with them. The State asked Birdieshaw if he knew whether or not the defendant owned a pistol. The defendant objected. The court overruled and the defendant excepted. Birdieshaw stated that the defendant did own a pistol. Birdieshaw further stated that he believed the defendant owned a .38 pistol. The defendant objected. The court overruled and the defendant excepted. During the week and some time after November 4, 1975, Birdieshaw went with the defendant to Gadsden to see one of the defendant's clients concerning the selling of Pet Supplies. During that week the defendant made no declaration or statement to Birdieshaw *Page 1227 
about any event occurring on the night of November 3, 1975.
When the State rested, appellant made a motion to exclude the evidence on the grounds that the officers had promised appellant immunity from prosecution in exchange for his testimony as a State witness against Miles. The court overruled this motion. Appellant then moved the court to exclude the evidence on the ground the State had failed to adduce evidence to corroborate the accomplice, Danny Ray Miles. The court overruled this motion and held that if Miles was an accomplice his testimony was sufficiently corroborated to submit the case to the jury.
Appellant did not testify. The only testimony offered in his behalf was to recall the State's witnesses and prove by them that Miles had a bad reputation in the community; that he had a bad reputation for violence, and they would not believe him on oath in a court of law whether he was interested or not.
We have gone to great pains to set out the evidence in this case because of the many issues raised on this appeal. We very probably have overextended the recitation of the facts in the light of the conclusions we have reached but this was purposely done so that in the event of a future review of this opinion no one need wonder if there are any facts in the record that remain hidden away.
We start with the statement that appellant is not entitled to immunity from prosecution under the indictment returned in this case.
In Long v. State, 86 Ala. 36, 44, 5 So. 443, 448, the Supreme Court held:
 "When an accomplice is examined as a witness by the prosecutor, and fully and fairly discloses the guilt of himself and associate, there is an implied promise, as generally regarded, that he will not be prosecuted for the same offense. In such case, the prosecuting officer may decline to institute proceedings against him, or may discontinue them if already commenced. If this course is not pursued, the practice is to put the defendant on trial, and, if convicted, to recommend him to executive clemency. His right not to be prosecuted, or to a pardon is equitable only, based on the pledged faith of the public. He cannot plead the facts in bar of an indictment, nor avail himself of them by motion to dismiss the prosecution. * * *"
The holding in the Long case was reaffirmed by the Supreme Court in Odiorne v. State, 249 Ala. 375, 31 So.2d 132.
Title 15, Section 257, Code of Alabama 1940, provides that:
 "An indictment must not be quashed, dismissed, discontinued, or abandoned without the permission of the court; and such permission must be entered of record."
Under the settled law of this state law enforcement officers are utterly without power and authority to grant an accused immunity from arrest and prosecution for violating our criminal laws. To clothe them with such power and authority would strike at the very heart of our system of criminal justice and oust the courts of the powers invested in them by the Constitution and statutes. This is not to be taken to mean that prosecuting attorneys and judges are forbidden to grant an accused immunity from prosecution for criminal offenses in exchange for his testimony as a State witness against other accused of crimes, or to testify against a co-indictee.
From the evidence in this case we do not believe it can be successfully gain — said that Miles was an accomplice in the commission of this crime. The State contends that the burden of proving that Miles was an accomplice was on appellant and cites many cases in support of this proposition. These cases do not apply where the State's evidence undisputedly makes the witness an accomplice. Childs v. State, 43 Ala. App. 529, 194 So.2d 861.
The State claims that the following instances constitute corroborative evidence:
1. Sergeant Wallace's testimony that prior to any arrest he had information from Miles's girl friend, Ava Williams, that Miles and appellant were together that night. *Page 1228 
2. James Birdieshaw's testimony that he was with Miles and appellant on the afternoon of November 3, 1975, and that he believed he heard Miles say that he and appellant were going to Terry's Time Machine Lounge that night.
3. Sandra Triplett's testimony that Miles's fingerprints were found at the 2010 Lounge, thus establishing his presence there as he had stated.
4. Alma Vest's identification of appellant and Miles as being two of the three remaining in the lounge when she and her date left. The third man, she stated, was Ronnie White, the other victim besides Mrs. Knabe.
5. Gus Konstant's testimony that Mrs. Knabe's practice was to immediately clean off the tables as soon as customers left the lounge; thus, corroborating Miles's account as to the precise moment appellant drew his pistol in the lounge. It can be drawn from the evidence that appellant drew his gun immediately after Alma Vest and her date left; thus preventing Mrs. Knabe from cleaning the tables.
6. Sergeant Higgins' testimony that the bullets recovered from the wall of appellant's apartment and the wall of the 2010 Lounge were fired from the same gun as were the bullets which were recovered from Mrs. Knabe's body. This directly corroborated Miles's testimony of the events of that night.
It must be remembered that the trial court excluded from the evidence the bullet recovered from appellant's apartment on the same basis that appellant's statement to the officers was suppressed, viz., the officers failed, by design, to give appellant the Miranda rights and warnings.
The evidence clearly shows that no one except Miles puts a .38 caliber pistol in appellant's possession on the night or morning of the double murder. Miles is the only person that claims that appellant fired the pistol into the wall of the 2010 Lounge.
The bodies of Mrs. Knabe and Mr. White were found several hours and several miles from the 2010 Lounge where Alma Vest said she last saw them alive. No one except Miles puts appellant at the scene of the shooting and no one except Miles states that appellant committed the double murder.
Miles testified that appellant drove Miles's car from the murder scene to a body of water where appellant threw the pistol into the water and that en route to the place where the pistol was thrown into the water he and appellant threw the clothes of Mrs. Knabe and Mr. White from the car.
In Ex parte Senn, Ala., 344 So.2d 192, released by the Supreme Court on February 25, 1977, that court had occasion to restate the rule governing the sufficiency of corroborative testimony of an accomplice to sustain a conviction. In Senn the court said:
 "The corroboration which is sufficient to support the accomplices' testimony must be of some fact tending to prove the guilt of the defendant.
 `. . . It must be of a substantive character, must be inconsistent with the innocence of the accused and must do more than raise a suspicion of guilt. . . .'
Sorrell v. State, 249 Ala. 292, 31 So.2d 82, 83.
 "Such corroborative testimony need not be sufficiently strong in itself to support a conviction. `[I]t is sufficient if it legitimately tends to connect the accused with the offense.' Isbell v. State, 57 Ala. App. 444, 329 So.2d 133, 139
(1976, per Bookout, J.).
 "Analyzing the testimony in the case at bar we have the following corroborative evidence:
 (1) Petitioner and accomplice Griffin were seen by the owner of the tractor about 1:30 or 2:00 p.m. on the day before the tractor turned up missing driving at a high rate of speed on a road petitioner seldom used and near where the tractor was parked; and,
 (2) Petitioner was seen by a witness at accomplice Griffin's house the evening before the tractor turned up missing *Page 1229 
when he picked up accomplice Griffin with whom he drove off.
 "We are convinced that this testimony is not sufficient to corroborate the two accomplices.
 "Other `corroborating' details mentioned in the opinion of the Court of Criminal Appeals are physical facts which simply corroborate the `commission of the offense' but do not tend to connect the petitioner therewith.
 "Being seen in the company of an accomplice in close proximity in time and place to the commission of a crime is not in itself always sufficient corroboration to meet our statutory requirements. Tidwell v. State, 37 Ala. App. 228, 66 So.2d 845
(1953, per Harwood, J.). On the other hand, if the accused and accomplice are seen together in unusual places and in close proximity in time and place to the scene of the crime, which was committed at an unusual hour, the requirements of corroboration may be met. Tidwell, supra.
 "This case is factually very close to Kemp v. State, 24 Ala. App. 591, 139 So. 437 (1932), wherein it was stated:
 `. . . The only evidence of corroboration claimed in this case by the state is that this defendant was seen on the streets of the village where the crime was committed in company with the accomplice, riding in a model T. Ford car, on the night of the burglary; that they passed up the street in open view three times, the last time going in the direction of defendant's home. Nobody saw them doing anything out of the ordinary, and nobody testifies as to when the store alleged to have been broken into was entered. The corroboration required by the section of the Code cited must be of some fact connecting defendant with the crime which will strengthen or make stronger the testimony of the accomplice. Segars v. State, 19 Ala. App. 407,
 97 So. 747; Wallis v. State, 18 Ala. App. 108, 90 So. 35.' (Emphasis added.)
 "Likewise, in Commander v. State, 28 Ala. App. 42, 178 So. 241 (1938), it was held that the fact defendant was seen in the company of an admitted accomplice on the afternoon of the night of the alleged crime, which, from the testimony, was committed several hours thereafter, was no corroboration of the accomplice's testimony."
We conclude that the corroborating testimony was insufficient to meet the requirements of Title 15, Section 307, Code of Alabama 1940.
There are other claimed errors which entitle appellant to a reversal but we forego treating them as they will not likely reoccur in the event this case is tried again.
REVERSED AND REMANDED.
All the Judges concur.