Appellant was indicted, convicted, and sentenced to thirteen months imprisonment for inciting Cecil Dupree to violate the Ethics Act. More specifically, he was found guilty, under § 13-9-40, Code of Alabama 1975, of inciting Dupree, the president of an independent telephone company regulated by the Public Service Commission [hereinafter "P.S.C."], to provide a prostitute for Ralph McLemore, Executive Director of the P.S.C., in violation of § 36-25-12, Code of Alabama 1975. The latter section provides, in pertinent part, the following:
 "No person shall offer or give to a member or employee of a governmental agency, board, or commission that regulates a business with which such person is associated . . . anything of value . . . while the member or employee is associated with the regulatory agency, board or commission. Expenses associated with social entertainment afforded members and employees shall not be deemed a thing of value within the meaning of this section."
On June 25, 1979, appellant was an employee of South Central Bell Telephone Company [hereinafter "Bell"]. His title was "Industry Relations Manager" and his duties were to act as Bell's liaison with the independent telephone companies operating in the State. Appellant was also a partner in Grayford Electronics Company, which marketed a telephone line testing device, called a "looperback" system, to independent telephone companies. Grayford is not regulated by the P.S.C.
On the same date, Cecil Dupree was the president of GraCeba Total Communications, an independent telephone company located in Ashford, Alabama, and regulated by the P.S.C. In September of 1978, GraCeba bought a looperback system from *Page 264 
Grayford Electronics. Later in April of 1979, Grayford was negotiating the sale of another looperback system to customers in Florida, and needed a place to demonstrate the device. Appellant asked Cecil Dupree to allow Grayford to use GraCeba's facilities for the demonstration and Dupree agreed.
Prior to June 25, 1979, appellant and Dupree had discussed the fact that Ralph McLemore would be coming to Alabama as the executive director of the P.S.C. Dupree testified that, in an effort to get to know the man with whom he would be dealing in the future, he attempted to discover McLemore's personal habits and concluded that McLemore had "a liking for women." Dupree suggested to appellant that the two of them "fix up Mr. Mac . . . with a lady friend." Later, appellant called Dupree to say that McLemore had been asking when they (appellant and Dupree) were going to "fix him up" and "arrange a party."
On June 25, 1979 Dupree reserved a suite for McLemore at the Ramada Inn in Montgomery. That evening McLemore, appellant, Dupree and two women had drinks together in McLemore's room. Appellant, Dupree and one of the women then departed, leaving McLemore and the other woman alone. McLemore's female companion for the evening stated that Cecil Dupree gave her $100. and told her to "make Mr. McLemore happy." She testified that she took the money, spent the night with McLemore, and had sexual relations with him.
Appellant saw Dupree the following day and inquired how much the previous night had cost. Dupree testified that he told appellant "$200," and that appellant then wrote a check on the Grayford account payable to GraCeba in the amount of $250. and said that he (appellant) wanted to pay Dupree something for the help and goodwill GraCeba had extended to Grayford on the looperback demonstration for the Florida customers. Appellant stubbed the check "Engr. Exp.," which he testified meant "engineering expense."
Appellant's defense was that he had no knowledge that a prostitute had been provided for McLemore, and that he was merely helping Dupree with legitimate entertainment expenses in return for the favor extended by Dupree to Grayford Electronics.
The State's theory of the case was that appellant's inciting Dupree to furnish the prostitute for McLemore was part of a larger scheme, or conspiracy with Dupree and others, to influence the P.S.C. in its decision on a pending telephone rate increase request. The State's conspiracy theory was based on the following premises: (1) appellant was a friend and business acquaintance of one Larry Seab, an accountant who specialized in doing cost studies for independent telephone companies; (2) appellant convinced McLemore that the P.S.C. should hire Seab as a witness to testify during the telephone rate proceeding; (3) McLemore recommended that the P.S.C. hire Seab; (4) Seab was subsequently hired by the P.S.C. with public funds as an "expert witness to present the case for the consumer" pursuant to § 37-1-18, Code of Alabama 1975; (5) Seab's testimony was in favor of a rate increase; and (6) the P.S.C. granted Bell a sixteen million-dollar rate hike.
From the above premises, the prosecution argued for the conclusion that Seab gave false testimony and Seab's employment was due, in general, to appellant's attempts to "ingratiate himself with members, staff and employees of the P.S.C.," and in particular to the improper inducement (furnishing a prostitute) to McLemore. Then, based on its contention that it had shown a conspiracy, the State sought to introduce evidence of collateral offenses not charged in the indictment (specifically, illegal campaign contributions to two P.S.C. candidates one year earlier) in order to prove appellant's attempt to improperly influence the Public Service Commissioners themselves.
Over appellant's objections of irrelevancy, the trial court allowed the evidence relating to Larry Seab and the two illegal campaign *Page 265 
contributions to P.S.C. candidates on the grounds that all the transactions were part of a conspiracy to exert improper influence on the P.S.C. and were admissible to prove appellant's motive to commit the crime charged in the indictment.
 I
Appellant contends that his demurrer to the indictment should have been sustained because, under a strict construction of §36-25-12, supra, furnishing prostitutes is an example of the "expenses associated with social entertainment" specifically excluded from the prohibition of the statute.
While it is true that penal statutes must be strictly construed, McDonald v. State, 32 Ala. App. 606, 28 So.2d 805
(1947), the construction should not defeat the obvious intent of the legislature, Walton v. State, 62 Ala. 197 (1878), or destroy the spirit and force of the law the legislature intended to enact, American Tobacco Co. v. Werckmeister,207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208 (1907).
In addition, in construing a statute the court must, if possible, avoid a construction which would render the statute in conflict with other statutes. State v. Martin, 160 Ala. 190,48 So. 847 (1909); Bell v. Mar-Mill Steel Supply Co., Civ.App., 54 Ala. App. 432, 309 So.2d 471 (1975).
At the time the Ethics Act, including § 36-25-12, was enacted, another statute prohibited enticing or using a female for the purpose of prostitution. Ala. Code § 13-7-2 (1975) (formerly Ala. Code T. 14, § 3 (1940)). Thus, construing the Ethics Act to permit furnishing a prostitute for "social entertainment" would be at odds with the legislative intent, as expressed in § 13-7-2, supra, to prohibit the same conduct.
We therefore find that the legislature did not intend to exempt payments to a prostitute as "expenses associated with social entertainment," and appellant's demurrer on this ground was correctly overruled.
 II
Appellant argues that the State should have been estopped to indict him because he was induced to give incriminating grand jury testimony by the district attorney's promise not to prosecute him. Appellant claims the promise not to prosecute was implicit in the following pre-indictment statements made to him by the district attorney:
 "You [appellant] are either going to be a defendant or a witness."
"We're not after you; we're after McLemore."
 "If [you] quit playing games with us about the whores that were furnished to McLemore, [then you] could be a witness for the State."
The State did not deny that the above statements were made. It contended, however, that the comments were not offers of immunity and did not work an estoppel because appellant did not rely on them in deciding to testify. The State points out that appellant appeared before the grand jury only after Miranda
warnings and advice of counsel; his decision to testify was not therefore prompted by his reliance on the claimed promise not to prosecute. Alabama has not embraced the estoppel theory to uphold non-statutory grants of immunity. See Gipson v. State,375 So.2d 504 (Ala.Cr.App. 1978), affirmed, 375 So.2d 514 (Ala. 1979). See also Yarber v. State, 375 So.2d 1212 (Ala.Cr.App. 1977), reversed on other grounds, 375 So.2d 1229 (Ala. 1978), on remand, 375 So.2d 1231 (Ala.Cr.App. 1978), reversed,375 So.2d 1231 (Ala. 1979), on remand, 375 So.2d 1236 (Ala.Cr.App. 1979). Furthermore, even under the estoppel theory, there must be an explicit immunity agreement upon which the accused relies. See People v. Brunner, 32 Cal.App.3d 908, 108 Cal.Rptr. 501
(1973).
In the present case, we do not find that the district attorney's remarks amounted to an unambiguous offer of immunity or, taken in light of subsequent Miranda warnings to the appellant, could have prompted any reliance that appellant *Page 266 
would not be prosecuted. We therefore hold that the State was not estopped to indict or prosecute the appellant.
 III
Appellant insists that the trial court erred by admitting irrelevant evidence, specifically testimony concerning four instances of alleged misconduct not charged in the indictment, namely: (1) evidence that appellant caused McLemore to have Seab hired as a witness during the rate hearings; (2) evidence of an illegal campaign contribution to P.S.C. candidate Pete Matthews; (3) evidence of an illegal campaign contribution to P.S.C. candidate Juanita McDaniel; and (4) evidence that appellant was "double-dipping" on his expense accounts with Bell and Grayford.
While we believe that the first two evidentiary matters were admissible for the reasons and to the extent discussed hereinafter, it is our judgment that the last two were inadmissible, highly prejudicial, and constitute grounds for reversal.
A. Evidence Relating to Larry Seab.
On the rationale of proving an overall conspiracy to influence the P.S.C., or of showing appellant's motive to commit the specific offense on June 25, 1979 as charged, the trial court admitted evidence of a conversation between Dupree and McLemore sometime between July 11-14, 1979. The State questioned Cecil Dupree as follows:
 "Q. All right. Now, did you have a conversation with Mr. McLemore in the presence of Mr. Mayberry?
"A. Yes, sir.
 "Q. What, if anything, did you say to Mr. McLemore in the presence of Mr. Mayberry?
 "MR. CULPEPPER: Same objection, Judge, we noted previously.
"THE COURT: Overruled. You may answer.
"Q. At the Biloxi symposium there.
 "A. I was talking to Mr. McLemore and discussing Larry Seab, the bad points, what I thought about him.
"Q. About who?
"A. What I thought about Larry Seab, which was . . .
"Q. What did you tell him?
 "A. I told him I didn't like him, I didn't trust him. I didn't want him doing my books and about the middle of the conversation Jim Mayberry punched me in the back and said, shut up about Seab, I just got McLemore to hire him as a special investigator or witness for the PSC.
 "MR. CULPEPPER: We make the same objection we previously made to his testimony.
"THE COURT: Overruled.
"MR. SMITH: And move to exclude it.
"THE COURT: Motion denied." [Emphasis added].
In our judgment, the emphasized portion of the above testimony, though weak and inconclusive, does tend to show appellant's motive for the offense charged. In an early case the Alabama Supreme Court stated the following:
 "When it is shown that a crime has been committed and the circumstances point to the accused as the guilty agent, then proof of motive to commit the offense, though weak and inconclusive evidence, is nevertheless admissible."
Baalam v. State, 17 Ala. 451, 453 (1850). See also Spicer v.State, 188 Ala. 9, 65 So. 972 (1914).
The foregoing testimony indicates that, for whatever reason, appellant wanted McLemore to have Seab hired to testify before the P.S.C., and he did not want Seab disparaged in McLemore's presence. It is not unreasonable to infer that McLemore agreed to appellant's request to hire Seab in part because of the inducement provided him some two to three weeks earlier on June 25. Thus, we cannot say, as a matter of law, that the foregoing evidence was inadmissible. "Testimony going to show motive, though motive is not an element of the burden of proof resting on the State, is always admissible. McDonald v. State, 241 Ala. 172,174, 1 So.2d 658 (1941). *Page 267 
We emphasize, however, that this testimony was admissible to show appellant's motive for the charged offense. Appellant was charged with inciting another to provide a prostitute for a P.S.C. employee. Proof that there was a conspiracy to providethe prostitute would have been admissible, see Pope v. State,365 So.2d 369 (Ala.Cr.App. 1978), but proof that there was a conspiracy to commit a separate, unrelated offense, not part of the same transaction or res gestae, see Svirbely v. State,53 Ala. App. 452, 301 So.2d 219 (Ala.Cr.App. 1974), was not admissible.
While we believe that the quoted portion of the testimony about appellant's persuading McLemore to have Seab hired was relevant to show appellant's motive for the charged offense, we do not believe that further testimony attempting to discredit Seab was allowable.
Permitting the State to show appellant's motive for the charged offense was proper. However, allowing the State to show Seab's motive for, or role in, another offense, gave the State too much latitude in proving a collateral matter.
For example, the State was permitted to introduce evidence relating to the following: (1) Seab's alleged "conflict of interest" between being a "consumer witness" and his financial ties to certain independent telephone companies; (2) Seab's motive to give false testimony before the P.S.C.; and (3) the propriety of using public funds pursuant to § 37-1-18, Code of Alabama, supra, to hire Seab.
From the foregoing, it is evident that a large portion of the State's evidence relating to Seab had no relevance to the crime charged in the indictment. We believe the Alabama Supreme Court addressed a similar situation in Spicer v. State, supra, a case of wife homicide, when it observed the following:
 "On the trial the state sought to prove, and did prove, that the defendant had procured several policies of insurance, in his favor, on the life of his wife; such policies aggregating about $17,000. This fact was admissible as tending to show motive on the part of defendant to take the life of the insured-deceased.
 "The trial court, however, allowed the state too much latitude in proving every detail connected with the procuring and collecting of the insurance policies. Many of these details were wholly irrelevant to any issue in the case, and could have no other effect than to either bias the jury or distract their minds from real issues to immaterial ones. For example, the state, over the objection of the defendant, was allowed to prove every conversation of the accused having the least reference to the insurance, though it tended to show neither guilt nor innocence, nor to corroborate or to contradict any relevant evidence.
 "One B.B. Kilpatrick, a brother-in-law of defendant, was allowed to testify: `He [defendant] didn't say anything about what he was going to do with the insurance money, but he told me how he was going to fix up the house; he didn't say whether he would do it with the insurance money or not.'
 "Witness was then asked the following question: `What did he say about that?' "After objection by the defense for illegality, etc., which objection was by the court overruled, witness stated in reply: `He stated to me that he was going to have the front part of his fireplace chiseled off, and have tiling fixed on each fireplace, and when the flies specked the other room a little more that he was going to wallpaper it, and that he was also going to wallpaper his dining room with paper that had good-looking fruits and vegetables, something good to eat — looked pretty nice." Here counsel moved to exclude this answer to the question last hereinabove objected to, on the same grounds assigned to the question. The court overruled said motion, and to the action of the court, in so overruling said motion, the defendant then and there duly and legally excepted.
 "This matter was, of course, wholly irrelevant; it could have no legitimate bearing on the issues. It had no tendency to *Page 268 
show guilt or innocence, nor to contradict or corroborate any other evidence. Its effect was to distract the minds of the jury from the real issue to that of whether or not it was proper for a man to improve his house after his wife is killed, whether by himself or some one else." [Emphasis added and citations omitted]
188 Ala. at 18-19, 65 So. 972. Likewise, we believe that the evidence relating to the propriety of Seab's employment, his claimed conflict of interest, and his allegedly falsified testimony, was so far removed from the issue of appellant's guilt of inciting to furnish a prostitute for McLemore, that it had the effect of distracting the minds of the jury from the real issue to that of whether or not the P.S.C. relied on the proper evidence in granting a telephone rate increase.
B. Campaign Contribution to Pete Matthews.
Dupree testified that he, appellant, and other telephone industry representatives attended a meeting with then-candidate for the P.S.C., Pete Matthews, at the Downtowner Motor Lodge in Montgomery after the Democratic primary election of 1978. At the meeting several utility company spokesmen questioned candidate Matthews about his political ambitions and philosophy of utility regulation.
Dupree stated that after the meeting he told appellant that he (Dupree) would like to give Matthews a contribution but his personal funds were low. He asked appellant to add $500. to the invoice for the looperback system he had agreed to purchase from appellant. GraCeba, Dupree's company, would then pay Grayford, appellant's company, the extra $500. and appellant would pass the money along to Matthews, explaining to Matthews where it had originated. Dupree testified, and the State introduced invoices to show that appellant padded the bill by $500. According to Dupree, appellant stated that he had paid Matthews and informed him the payment was from Dupree.
It is our opinion that this evidence was relevant under the "plan, design, scheme or system" exception to the collateral crimes rule. See C. Gamble, McElroy's Alabama Evidence, § 69.01 (6) (3d ed. 1977). See also McDonald v. State, 57 Ala. App. 529,329 So.2d 583, cert. quashed, 295 Ala. 410, 329 So.2d 596
(1975), cert. denied, 429 U.S. 834, 97 S.Ct. 99, 50 L.Ed.2d 99
(1976).
In order for evidence of a collateral offense not charged in the indictment to be admissible under the above exception, the charged crime and the other crime must have "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." Wigmore on Evidence, § 304 (3d ed. 1972).
In McDonald v. State, supra, this court affirmed the conviction of a judge for soliciting or accepting sexual favors to influence his official action. In McDonald we held that the trial court properly allowed evidence relating to four females, other than the one named in the indictment, who had been propositioned by the judge in connection with matters pending before him. We found a "connection and pattern" between the charged offense and the four other offenses, and we listed seven points of similarity all the transactions shared.
In the case before us, we also discern a connection and pattern between appellant's paying Dupree for the expenses incurred on the night of June 25, 1979, and appellant's padding the invoice to Dupree. The transactions share the following common features:
 1. Appellant and Dupree were the principals in each transaction.
 2. Each transaction involved an ostensibly innocent business deal concerning the "looperback" system.
 3. Each transaction involved Grayford and GraCeba; one dealt with a check from Grayford to GraCeba, the other a bill from Grayford to GraCeba.
 4. Each transaction was a "cover" for an illegal benefit to an employee or member of the P.S.C. *Page 269 
Additionally, we believe the evidence was relevant to rebut appellant's contention that his "engineering expense" notation was the result of innocence, inadvertence or mistake. See Smithv. State, 342 So.2d 422 (Ala.Cr.App. 1979).
C. Campaign Contribution to Juanita McDaniel.
Dupree testified that he and appellant were present at a meeting of independent telephone companies in Huntsville in the fall of 1978, when the following conversation occurred:
"BY MR. EVANS (Continuing)
 "Q. Mr. Dupree, were you at the Biloxi — Excuse me, the Huntsville . . .
 "MR. SMITH: Judge, we have a continuing objection to this line of questioning and your Honor's ruling, and we understand it we respectfully except.
"THE COURT: Yes, sir.
 "Q. Were you at the Huntsville telephone symposium in 1978?
"A. Yes, sir.
 "Q. Did you see the defendant in this case, Mr. Mayberry, there?
"A. Yes, sir.
 "Q. Did you have a conversation with Mr. Mayberry concerning a Mr. Larry Seab?
"A. Yes, sir.
 "Q. What, if anything, did this defendant, Mr. Mayberry say to you concerning Mr. Larry Seab?
 "A. Mr. Mayberry said I should hire Mr. Seab as my Cost Separation Accountant, that he was very good to the industry, telephone, and that he had arranged through Mr. Seab for a fifty thousand dollar political contribution for Juanita McDaniel."
[Emphasis added]
The State argues that this testimony was admissible to show "intent, motive, design and scheme." We have examined each exception to the collateral crimes rule and we do not believe the foregoing evidence was proper under any of them. The evidence that, through Seab, appellant "arranged for" an illegal campaign contribution to Juanita McDaniel shows no motive for him to procure, through Dupree, a prostitute for McLemore. There was simply no showing that the McDaniel matter and the particular crime charged had any similarity or connection other than to suggest in the appellant a disposition to commit the offense for which he was indicted. See Garner v. State, 269 Ala. 531,114 So.2d 385 (1959). For the same reason, the evidence does not indicate pattern, design, scheme or system. See McKenzie v.State, 250 Ala. 178, 33 So.2d 488 (1947). The two transactions were entirely dissimilar and the only character figuring in both was the appellant.
Likewise, it is our judgment that the evidence does not prove intent to furnish a prostitute for McLemore. Compare Caylor v.State, 353 So.2d 8 (Ala.Cr.App. 1977), cert. quashed,353 So.2d 11 (Ala. 1978) (State may not prove defendant's intent to kill one victim by showing his unrelated assault on another victim).
The only probative function of the foregoing evidence was to suggest appellant's "bad character, inclination or propensity to commit the type of crime for which he [was] being tried." C. Gamble, supra, § 69.01 (1) at 135. See also Mason v. State,259 Ala. 438, 66 So.2d 557 (1953). The prejudicial effect of the evidence was obvious. We hold that its admission was reversible error entitling appellant to a new trial.
D. "Double-Dipping" on Expense Accounts.
The State introduced four duplicate business expense vouchers submitted by appellant to both Bell and Grayford, indicating that appellant was reimbursed twice for the same expenses. The prosecution's rationale for the admission of these documents was to show a "pattern and practice of falsification . . . [i]f he will lie on an expense account, it is the State's contention that he will lie when he wrote `engineering expense' on a check to Cecil Dupree."
While the State was certainly entitled to rebut appellant's claim of innocence, mistake, *Page 270 
or inadvertence relating to the "engineering expense" notation on his check to Dupree, see Smith v. State, supra and authorities cited therein, it was entitled to do so only with relevant evidence. In our judgment, the evidence of the padded invoice to GraCeba (discussed at section III, B., supra) was relevant to rebut innocence, inadvertence, or mistake because it involved the same individuals, the same companies, and members of the P.S.C. as the offense charged in the indictment.
The proposed evidence here, however, involved Bell — not Cecil Dupree and GraCeba — and had no relation to the P.S.C. That an employee would lie to his employer on his expense account does not prove that he would falsify his personal check stub entry for prostitution expenses. As the Alabama Supreme Court observed inBrasher v. State, 249 Ala. 96, 30 So.2d 31 (1947):
 "Such testimony in its final analysis shows nothing more than the defendant's character is bad or that he is morally deficient."
Brasher v. State, supra, was a prosecution for carnal knowledge of a girl over twelve. The defendant denied the offense and the prosecution sought to prove identity by showing that he had previously performed degenerate sexual acts with a five-year-old girl, arguing that the prior offense indicated the defendant was "afflicted with general base desires for young girls."249 Ala. at 98, 30 So.2d at 32. The court determined that that argument was tantamount to stating that the defendant had a "disposition, propensity or inclination to commit such offenses. . . ." Id.
We see no distinction between the argument advanced by the State here and that asserted in Brasher. Both rest on the faulty premise that evidence is admissible if it shows that the defendant is a reprobate and is more likely to have committed the kind of crime in question. The evidence of "double-dipping" was inadmissible, extremely prejudicial, and warrants a new trial.
We have not addressed appellant's assertions of error concerning the sentencing phase of this case because we believe they are unlikely to reoccur in the event of a retrial.
For the errors shown, the judgment of conviction is reversed and the cause remanded to the Montgomery Circuit Court.
REVERSED AND REMANDED.
HARRIS, P.J., and BOWEN and BARRON, JJ., concur.
TYSON, J., recuses self under Canon 3 C. (1)(d), Alabama Canon of Judicial Ethics. (Niece's husband in law firm)