John Edward Allen, the appellant, was indicted and convicted for first degree rape in violation of Alabama Code 1975, §13A-6-61. Sentence was sixty years' imprisonment under the Habitual Felony Offender Act.
Because of our judgment that the introduction of evidence of other crimes than the one charged in the indictment prejudiced the defendant and denied him a fair trial, we address only two of the seven issues raised on appeal.
 I
The defendant was arrested the day following the rape. When Major Dan Davis of the Opelika Police Department turned on his blue light to make the stop, the defendant threw the victim's purse out the window of the truck he was driving. *Page 327 
The purse contained the victim's credit cards. In inventorying the defendant's property after his arrest, the victim's payroll check was found in his wallet. These items were properly admitted into evidence despite the fact that they were stolen one or two weeks prior to the rape. The trial judge admitted the evidence as indicating "consciousness of guilt" and found that the evidence tended to connect the defendant with the crime. In ruling that the victim's purse and credit cards were admissible, the judge stated: "If I remember the testimony of the prosecuting witness, she said the person that was there acted as if he . . . was aware of the premises. I am of the opinion that the credit card and purse tend to tie the defendant into the facts of awareness of the whole circumstances."
"Facts showing or tending to show a consciousness of guilt are always permissible, though not connected with the res gestae of the offense." Steward v. State, 398 So.2d 369, 375
(Ala.Cr.App.), cert. denied, 398 So.2d 376 (Ala. 1981).
The theft of the victim's purse may very well be considered to have been committed in preparation of the subsequent rape. "Antecedent circumstances tending to . . . show preparation to commit the crime are always admissible in evidence." Ellis v.State, 244 Ala. 79, 86, 11 So.2d 861, 868 (1943). "The rule [excluding evidence of other offenses] does not, however, exclude evidence of all other crimes, only those offered to show the accused's bad character." Ex parte Weeks,456 So.2d 404, 406 (Ala. 1984), cert. denied, ___ U.S. ___,105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). Evidence of the possession by the accused of other property than that involved in the crime charged "may be admitted where the circumstances are such that such evidence tends to prove the crime with which the defendant is charged." 29 Am.Jur.2d Evidence § 290 (1967).
 II
The defendant argues that the prosecutor's repeated references to evidence the judge had ruled inadmissible warranted the granting of the requested mistrial.
After the defendant had been arrested, his trailer was searched and found were "a large number of women's panties," "pornographic material," a brown wig, and two driver's licenses of females other than the victim. After the jury had been selected, but outside of their presence, defense counsel objected to the admission of the underwear. The trial judge responded by telling the District Attorney, "Don't argue about something that you are not going to be able to introduce." The judge stated:
 "I don't believe — just the fact that he had the panties, unless there's shown some connection. And later on it may turn out during the trial that they would be admissible. I'm not saying you can't introduce evidence. I just don't know."
Opelika Police Officer Victor Burt inventoried the defendant's personal property after his arrest. Burt testified before the jury that, besides the victim's payroll check, the defendant also had "two drivers license[s] containing the pictures of two white females." Defense counsel objected after this testimony had been elicited and the trial judge overruled his objection. Apparently, these licenses belonged to Sylvia Higdon and Peggy Beall.
After a hearing on the voluntariness of a statement the defendant had given the police after his arrest, defense counsel objected "to any testimony about the panties or pornographic materials." The trial judge ruled on the objection and the following occurred outside the presence of the jury:
 "THE COURT: I sustain the objection to that at this point. If it is later shown to have a connection, I'll reserve the right to rule further. But at this point I sustain the objection as to that.
 "MR. MYERS [District Attorney]: We don't plan to go into either the panties or the pornographic material at this point."
Without objection, Detective Danny Moss testified before the jury that, in searching the defendant's bedroom, he found a "brown wig" and a brown purse containing the identification of Deborah Davis Miller. *Page 328 
The District Attorney then asked the witness if he also recovered two checkbooks. Defense counsel's objection was sustained by the trial judge: "I sustain as to those items pertaining to some other person." The District Attorney explained the State's position outside of the hearing of the jury.
 "The State takes the position in this case and it is already well supported by the evidence that this defendant was gathering all kinds of personal belongings of various women in order to seek them out, as indicated we have the checkbooks, we have the purses and we have the other drivers licenses. And we think this is a common plan, scheme or design of the defendant whereby he went about selecting his victims."
The record contains absolutely no evidence whatsoever that the defendant sexually attacked or attempted to assault any other person. As the trial judge indicated, in sustaining the defendant's objection, "Just the fact that — unless you can show that he's done something to some of these persons —."
Immediately after the trial judge had sustained defense counsel's objection to "those items pertaining to some other person," the following occurred:
 "Q. [D.A.]: Did you find a multi colored purse containing the identification of Peggy Beall?
 "MR. CLAYTON [Defense Counsel]: Your Honor, I object.
"MR. MYERS: We withdraw the question.
 "MR. CLAYTON: No, sir, it is too late to withdraw the question.
"THE COURT: Don't argue among yourselves now.
"Q. All right, You may answer that.
"MR. CLAYTON: No.
"THE COURT: Step back up here."
* * * * * *
"THE COURT: What is the connection with Mrs. Beall?
 "MR. MYERS: I was just going to ask the question and if Mr. Clayton wants to object he can object.
 "THE COURT: No, no. Don't do that. I don't think that is —
 "MR. CLAYTON: What he is doing by bringing all this up is he's pressuring my client and I'm going to move for a mistrial.
 "THE COURT: I'm not going to grant your motion for a mistrial. I deny that. But don't go into things regarding other people unless you're in a position to show connection with this." (Emphasis added.)
Shortly after this ruling, the trial judge reminded the District Attorney, "Don't go into other stuff from other people unless you —."
In testifying about the statement the defendant gave the police, Officer Gary Knight stated that the defendant "was also asked about a variety of women's underwear —." The prosecutor interrupted the witness and stated "that is something that the Court has cautioned us not to go into at this point in time."
The trial judge denied defense counsel's request for a mistrial because "[t]his witness was not present when I issued the order. And I think it came out voluntarily on his part, so I deny your motion. And he hasn't gone into any details." Contrary to the judge's statement, the record indicates that Officer Knight was excused from the witness stand only after the judge issued his order.
Later in the trial, defense counsel did not object to the District Attorney's question to Officer Burt, "Also yesterday you testified about removing from the defendant's possession a payroll check made out to [the victim] and two drivers licenses belonging to other white females."
On cross examination of the defendant's ex-wife, who lived in the trailer with the defendant, the District Attorney asked, "Do you know of any reason that the defendant would have a brown wig?" There followed a conference at the bench:
 "MR. MYERS: Judge, he put her on the stand. I didn't. And she says she is familiar with the entire trailer. And I've *Page 329 
got a right to go into these things at this point. I didn't go into it on direct, but I want to go into the panties. I want to go into the billfolds. And I want to go into the wig.
"THE COURT: No.
"MR. MYERS: Why?
 "THE COURT: Because that is a separate crime. He is not charged with possession of these —
 "MR. MYERS: I'm not charging him with having them but I think it goes to the type of individual that he is.
 "THE COURT: I deny your request. I've said no, and that's the ruling."
Despite the judge's ruling, the District Attorney almost immediately resumed similar tactics:
 "Q. I show you a couple of drivers license that have been marked State's Exhibit Number 8 and 9 —
 "MR. CLAYTON: Your Honor, I'm going to make the same objection to those.
"THE COURT: Let him ask the question.
 "Q. — and ask you if you recognize those drivers licenses?
 "MR. CLAYTON: Your Honor, I'm going to make the same objection to those as I did to the wig.
 "THE COURT: Overrule the objection as to whether or not she knows.
 "Q. All right. Do you know either of the white females pictured in those drivers licenses?
"A. No, sir, I've never seen them.
"Q. They're not yours, are they?
"A. It don't look like me."
* * * * * *
 "Q. All right. And you're familiar with John's room, aren't you?
"A. Pretty much, yes, I guess.
 "Q. You've seen what all John had in his room, haven't you?
 "A. I guess most of everything. I don't go snooping in there or nothing like that.
 "Q. Have you ever stored any of your clothing in there?
 "A. Yeah. I have some clothing that's hanging in that small closet in there.
 "Q. All right. Have you ever stored any panties in there?
"A. No, sir, not that I know of.
"Q. Could you have possibly in the past?
"A. Well, I possibly could have.
 "Q. Could you have stored 60 or 70 pair of ladies panties in there?
"A. No, sir."
There followed no objection.
On cross examination of defense character witness Barbara Cowen, the prosecutor was allowed to show her two driver's licenses and to ask her, over the objection of defense counsel, "I would like for you to look at State's Exhibits 8 and 9, these drivers licenses of two white females and ask if you recognize either one of those people?" Ms. Cowan indicated that she had never seen either person.
Our review of the record reveals that the jury had before it testimony that when the defendant was arrested he had in his possession the driver's licenses of two white females other than the victim; that in the defendant's room were found a brown wig and Ms. Miller's purse and identification; and that the defendant was questioned by the police about "a variety of women's underwear."
The rule is stated in Madison v. State, 55 Ala. App. 634, 641,318 So.2d 329, 336, cert. denied, 294 Ala. 764, 318 So.2d 337
(1975):
 "Statements by prosecutor of facts not in existence, or which have been excluded from evidence, are improper per se. Such statements are grounds for reversible error where their impact upon the jury would be so prejudicial that proper instruction by the trial court would not eradicate their prejudicial effect."
This rule is also found in McAdory v. State, 62 Ala. 154, 163
(1878):
 "[C]ounsel should not be permitted to comment upon facts not proved before the jury as true, and not legally competent and admissible as evidence. However *Page 330 
reluctant an appellate court may be to interfere with the discretion of a primary court in regulating the trial of causes, if it should appear that it had refused, to the prejudice of a party, to compel counsel to confine their arguments and comments to the jury, to the law and evidence of the case under consideration — if it had permitted them to refer to and comment upon facts not in evidence, or which would not be admissible as evidence, it would be a fatal error."
"It is the generally accepted rule that it will constitute grounds for a new trial if counsel, in disregard of the court's ruling that a certain line of evidence is inadmissible, persists in attempting to get such evidence before the jury to the prejudice of the unsuccessful party." Birmingham BaptistHospital, Inc. v. Blackwell, 221 Ala. 225, 228, 128 So. 389,392 (1930).
 "Where an incompetent question is asked, opposing counsel must either permit it to be answered or enter his objection; and, although the trial court refuses to permit the question to be answered, the very fact that the same question in a different form is repeatedly asked, and a vigorous objection interposed to its answer, emphasizes its importance in the minds of the jury, and necessarily prejudices the case, and for this reason, if for no other, where this practice is pursued to the extent indicated in the record in this case, the judgment should be reversed." Blackwell, 221 Ala. at 229, 128 So. at 392.
See also Gwin v. Church, 272 Ala. 674, 682, 133 So.2d 880, 889
(1961). "[A]rgument or statement persistently made, or improper questions asked in defiance of the ruling of the court, by counsel, intentionally for the purpose of getting before the jury facts or statements not admissible, and calculated to prejudice the judgment of the jury, demands prompt interference of the court, and a verdict obtained by such practice should not be allowed to stand." Alabama Power Co. v. Berry, 222 Ala. 20,23, 130 So. 541, 543 (1930).
Because the trial judge did not restrain the prejudicial questions of the prosecutor and because that prosecutor continually injected extraneous and illegal evidence into the trial, we must reverse the defendant's conviction. In Ex parteFarley, 406 So.2d 1050, 1051 (Ala. 1981), our Supreme Court warned, "Trial courts are possessed of ample powers to deal with conduct of attorneys who fail to conduct themselves according to high standards of courteous and correct behavior in the trial of cases; the trial courts should not hesitate, in proper instances, to exercise those powers."
The questions about and evidence of the driver's licenses of Ms. Higdon and Ms. Beall and the "two checkbooks" had no place in the trial for the rape of M.J. The repeated references to the large quantity of panties found in the defendant's room, as well as to Ms. Miller's purse and the brown wig, also served only to impress the jury that the defendant was probably some type of sexual pervert. The sole purpose of this evidence was to prejudice the accused by suggesting that he was more likely to be guilty of the crime in question. It showed the defendant's bad character. Yet, however deviate it made the defendant appear, this evidence did not show that he raped the victim. C. Gamble, McElroy's Alabama Evidence, § 69.01 et seq.
(3d ed. 1977).
The State could not prove that the driver's licenses, the checkbooks, the purse, the wigs, and the panties showed a common plan or scheme that revealed how the defendant selected his victims simply because the State never even offered any evidence that there was another victim. From what the record shows, the State's theory rested on mere conjecture and speculation.
"Under Alabama law, evidence of any offense other than that specifically charged is prima facie inadmissible." W. Schroeder, Evidentiary Use In Criminal Cases Of CollateralCrimes And Acts. A Comparison Of The Federal Rules And AlabamaLaw, 35 Ala.L.Rev. 241, 247 (1984). See also Allen v. State,380 So.2d 313, 328 (Ala.Cr.App. 1979), cert. denied, *Page 331 380 So.2d 341 (Ala. 1980), cert. denied, 449 U.S. 842, 101 S.Ct. 121,66 L.Ed.2d 49 (1980). The rule is stated in Garner v. State,269 Ala. 531, 533, 114 So.2d 385, 386 (1959):
 "[T]he State is not permitted to give in evidence other crimes alleged to have been committed by the defendant unless they are so connected by circumstances with the particular crime charged as that proof of one fact with its circumstances has some bearing on the issue on trial other than to show in the defendant a tendency or disposition to commit the crime with which he is charged."
The general exclusionary rule is a "concomitant of the presumption of innocence," which requires that "a defendant . . . be tried for what he did, not for who he is." United Statesv. Myers, 550 F.2d 1036, 1044 (5th Cir. 1977), cert. denied,439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). Under the common scheme, plan or design exception to this rule, the crime charged and the collateral crime must have "`such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" Mayberry v. State, 419 So.2d 262,268 (Ala.Cr.App. 1982).
Here, the State simply failed to prove the relevancy or materiality of the other offenses to the crime charged. "[E]vidence of other crimes must be both relevant and material." Ex parte Killough, 438 So.2d 333, 335 (Ala. 1983). Had the State been able to show that the defendant had either sexually assaulted or attempted to sexually assault one of the "other white females" whose personal items were found either in his personal possession or at his home, such evidence may have been admissible to establish a common plan or scheme.
However, this evidence did not tend to show that the defendant raped the victim. It was highly prejudicial, tending only to show the defendant's moral depravity and to inflame the jury.
 "At one time evidence of other recent sex offenses or sexual depravity was admissible to show intent to indulge in sexual experiences and to identify the defendant as the person who committed the sex act in question. . . . However, subsequent cases modified this rule to require some peculiar connection between the cases or some relevancy other than to show the moral delinquency of the defendant." Collateral Crimes Evidence, 35 Ala.L. Rev. at 265, n. 171.
Here, there was no evidence to show that the present crime, the rape of a named victim, was committed by the defendant as part of a system or plan begun by stealing the personal identifications and property of the other women. See Note,Criminal Law-Evidence-Admission of Evidence of Other CriminalActs in Rape and Statutory Rape Trials, 2 Ala.L.Rev. 108, 110 (1949).
Although the State presented a very strong case against the defendant, the ultimate issue for the jury was whether to believe the testimony of the victim or that presented by the defendant's witnesses. A short time after the jury had begun their deliberations, they announced that they were "definitely a locked jury." This precludes any finding that the error in this case was harmless. The defendant was entitled to be tried for the crime with which he was charged and no other. Because he was denied that right, his conviction is reversed and this cause is remanded for a new trial.
REVERSED AND REMANDED.
All Judges concur. *Page 332