William W. Gillespie was charged by separate indictments with four instances of first degree sexual abuse and one instance of first degree sodomy. The five cases, which involved three victims, were consolidated for trial and a jury found Gillespie guilty on three of the charges of first degree sexual abuse. The jury was deadlocked with regard to the remaining two charges (first degree sexual abuse and first degree sodomy) and the trial judge ultimately granted Gillespie's motion for judgment of acquittal on those two charges. Gillespie received a sentence of five years' imprisonment on each of the three charges *Page 641 
on which he was convicted, those three sentences to run concurrently. His sentences were "split," with one year to be served in the penitentiary and four years to be served on probation. He was ordered to pay court costs and $250 to the Victim's Compensation Fund in each case.
The state's case-in-chief consisted primarily of the testimony of S.A. and B.P. — the two victims involved in the three charges of which Gillespie was convicted. Each testified that Gillespie reached inside her bathing suit and touched her private parts with his finger while she was swimming in his backyard pool.[1] Parents of the victims also testified. This testimony, except as discussed in Part I below, was mainly concerned with either general events surrounding the swimming pool incidents or the fact that the children had complained to them of Gillespie's actions. The only evidence of the crimes was the testimony of the victims themselves. There was no other eyewitness testimony or corroborating medical testimony.
Gillespie testified in his own defense. He stated that in tossing children, both girls and boys, in his pool, he would pick them up by placing one hand on their shoulder and one hand between their legs. However, he unequivocally denied touching any of the victims in an inappropriate manner. Essentially, each case turned on whether the jury believed the victims or the defendant.
Gillespie raises only one issue on this appeal. He contends that he was denied a fair trial due to the misconduct of the prosecutor[2] throughout the course of the trial. He asserts that the cumulative effect of this misconduct unfairly prejudiced the jury against him. We agree.
Although Gillespie alleges error due to a number of specific acts of the prosecutor, we need address only two: (1) the repeated questions and innuendo implying that Gillespie had committed other acts of sexual misconduct, and (2) the prejudicial questions propounded to Gillespie during cross-examination concerning the Klu Klux Klan.
In Sprinkle v. State, 368 So.2d 554 (Ala.Cr.App. 1978), cert. quashed, 368 So.2d 565 (Ala. 1979), this court set forth in detail the duties and responsibilities of the prosecuting attorney:
 "The primary duties of the office of the District Attorney are to see that justice is done, Adams v. State, 280 Ala. 678, 198 So.2d 255 (1967), and to see that the state's case [is] properly presented to the court and jury as made by the evidence. Wilbanks v. State, 28 Ala. App. 456, 458, 185 So. 770 (1939); Williams v. State, 34 Ala. App. 253, 39 So.2d 29 (1949).
 " 'The office of solicitor is of the highest importance; he is the representative of the state, and as a result of the important functions devolving upon him as such officer necessarily holds and wields great power and influence, and as a consequence erroneous insistences and prejudicial conduct upon his part tend to unduly prejudice and bias the jury against the defendant; this, without reference to the instructions of the court. The test in matters of this kind is not necessarily that the conduct of the solicitor complained of did have such effect upon the jury, but might it have done so?' Taylor v. State, 22 Ala. App. 428, 429, 116 So. 415, 416 (1928); Jones v. State, 23 Ala. App. 493, 495, 127 So. 681 (1930); Bynum v. State, 35 Ala. App. 297, 298, 47 So.2d 245, cert. denied, 254 Ala. 22, 47 So.2d 247 (1950).
 "In the performance of his duties the District Attorney should treat the defendant fairly and the witnesses courteously, both in examination and in argument. Campbell v. State, 19 Ala. App. 349, 352, 97 So. 783 (1923). The prosecuting attorney has a duty to be fair and impartial in presenting the evidence and in examining *Page 642 
or cross examining witnesses. Melton v. State, 21 Ala. App. 419, 109 So. 114 (1926). While he may not take unfair advantage of a defendant, he is under a duty to prosecute with earnestness and vigor. Arant v. State, 232 Ala. 275, 167 So. 540 (1936)."
Sprinkle, 368 So.2d at 560. In Wysinger v. State,448 So.2d 435, 438 (Ala.Cr.App. 1983), we noted:
 "In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses '[o]ur task is to consider their impact in the context of this particular trial,' and 'not view the group of allegedly improper questions and comments in the abstract.' United States v. Davis, 546 F.2d 583, 593 (5th Cir. 1977). '[W]e must assess the impact of the questions in the context of the entire trial.' United States v. Bosby, 675 F.2d 1174, 1185 (11th Cir. 1982)."
Wysinger, 448 So.2d at 438 (emphasis added). With these principles in mind, we turn now to a discussion of the alleged instances of prosecutorial misconduct.
 I
R.G., Gillespie's daughter and the mother of the victim involved in the cases on which Gillespie was ultimately acquitted, was called as a witness by the state. During direct examination, she responded affirmatively to the prosecutor's question: "Did you also make certain reports about your father?" (Emphasis added.)
During the cross-examination of Gillespie's wife, who testified as a defense witness, the following exchange occurred:
 "Q. [By the prosecutor] And didn't you testify that the custom had evolved that sometimes the [victims S.A. and B.P.] came and swam without their parents?
 "A. No, I said the children often were at the house without their parents. [The mother of S.A. and stepmother of B.P.], in fact, had left them in [Gillespie's] custody a number of times to babysit them.
"Q. That was before she knew about him, wasn't it?
 "A. I don't know what you mean by that, sir. I object to that question.
 "By Mr. Law [Defense Counsel]: Your Honor, I object to that question and ask the court to instruct the jury to disregard it.
 "By the Court: All right, he has asked the question, go ahead, next question.
"By [the prosecutor]:
 "Q. Now, Mrs. Gillespie, you seemed righteously indignant when I asked you that question; you have heard allegations about your husband of a similar nature before, haven't you?
"By Mr. Law: Judge, I object.
"By the Court: Sustained.
 "By Mr. Law: I would like to make a motion outside the presence of the jury." (Emphasis added.)
There followed an in-chambers discussion during which the prosecutor asserted that "We believe we can show that the defendant was charged with incest with his own daughter in a church court, and she [his wife] was aware of those charges. The result of that is, he was excommunicated from the Church of Jesus Christ of Latter Day Saints." The trial judge responded and stated in effect that at "a previous hearing on this excommunication business" the evidence showed that the defendant was excommunicated not for incest but "because of an abortion that his daughter had" and that the church records of that excommunication had been destroyed. The judge indicated that he had previously ruled that "if the records were not available, that [the prosecutor] would not be allowed to get into that." The trial judge instructed the prosecutor not to ask any witness "about any prior acts or religious questions, until we get the witnesses * * * in from the church, a church official."
The trial court sustained Gillespie's objection to the questions which occasioned the in-chambers discussion, stating "and I'll explain it to the jury." Gillespie then made a motion for mistrial on the basis that the prejudicial effect of the prosecutor's questions implying that he had committed other acts of sexual misconduct could not be eradicated. The trial judge denied this motion, saying "I can take care of it." *Page 643 
Notwithstanding these instructions, shortly after resuming cross-examination of Mrs. Gillespie, the prosecutor asked:
 "Q. Okay, and are you aware that your daughter [R.G.] testified she herself had filed allegations against your husband?
"A. No, I was not aware of that.
 "Q. Are you aware that she later changed those allegations —?
"By Mr. Law [Defense Counsel]: Judge —.
 "By [the prosecutor]: Judge, this was testified to.
 "By the Court: That's the little girl's mother? When did she make allegations?
 "By [the prosecutor]: Judge, if we could go back to her testimony, the last couple of questions I asked her, related specifically to this.
"By Mr. Law: They related to [the child].
"By [the prosecutor]: [R.G.].
 "By the Court: Talk about the little girl, — the allegations made by the little [girl] if I recall — first of all, I'll sustain that, I don't remember that evidence being in. It's for the jury to remember.
"By [the prosecutor]: May we look in the record?
 "By the Court: I don't think it's necessary. It's for the jury to remember what the evidence was in the case. I have already instructed you on that, and I'll instruct you again. I'll caution you, that if you go into anything, if you are going to make statements as opposed to asking questions, make sure it's the evidence in this case. . . ." (Emphasis added.)
The prosecutor took issue with the trial judge's ruling and stated, "I think it's critical to our case." This entire exchange took place in the hearing of the jury.
On direct examination, Mrs. Gillespie had stated that she had never "notice[d] anything inappropriate about [Gillespie's] behavior around these children," obviously referring to B.P. and S.A. Upon resuming cross-examination, the prosecutor had Mrs. Gillespie confirm this testimony. He then stated:
 "Your Honor, I would like to ask her the question I previously asked her, based on that.
"By Mr. Law: Judge —.
 "By the Court: Wait a minute, wait a minute. I have made my ruling. Y'all know what the ruling is.
Let's continue to try the case."
While the prosecutor was cross-examining Gillespie, the following occurred:
 "Q. And [R.G.] also testified, did she not, that she made allegations against you?
"By Mr. Law: Judge —.
"A. No, sir, she did not.
"By Mr. Law: Object.
 "By the Court: Overruled, it's for the jury to remember what the testimony was.
". . . .
 "Q. How often have you talked to your daughter, [R.G.], and your granddaughter, since they made these allegations about you?
"A. How often have I talked to them?
"Q. Yes, sir?
 "A. Whenever the occasion — I mean, whenever they were there.
"Q. They've been coming over to your house?
"A. Yes, sir.
"Q. You like little girls, don't you?
 "By Mr. Law: Judge, Judge, Judge. I object to the form of that question.
"By the Court: Sustained.
"By [the prosecutor]:
 "Q. When you had those little girls, holding them in the pool, and when you had them laying down on your bed, and you were rubbing that lotion on them, you couldn't resist touching them, could you? And you did it, didn't you?
 "A. I, — I, — I, — I understand the sleazy way you're saying that, but —.
"Q. Thank you, sir —.
 "A. That doesn't intimidate me. No. I did not ever touch those girls sexually, not those little girls or any other little girls, never. *Page 644 
 "By [the prosecutor]: In view of that last response, I would ask the court to allow me to go into the matters we discussed earlier.
"By Mr. Law: I object.
"By the Court: Sustained.
 "By [the prosecutor]: Does that mean you won't let me, judge?
"By the Court: Sustained, sustained.
"By [the prosecutor]: All right.
"By [the prosecutor]:
 "Q. So, you have never done anything like that to any little girls at any time; is that what you just said?
"A. Yes, sir.
 "By [the prosecutor]: Judge, could I ask one more time?
"By the Court: No." (Emphasis added.)
" 'It is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner knows he cannot support by the evidence.' " Bezotte v. State,358 So.2d 521, 525 (Ala.Cr.App. 1978). Accord Daniel v. State,534 So.2d 1122 (Ala.Cr.App. 1988); Young v. State,363 So.2d 1007 (Ala.Cr.App. 1978). Additionally, reversible error occurs where the trial judge fails to adequately restrain a prosecutor from persistently asking improper questions or making improper statements " 'in defiance of the ruling of the court, . . . intentionally for the purpose of getting before the jury facts or statements not admissible, and calculated to prejudice the judgment of the jury. . . .' " Allen v. State, 478 So.2d 326,330 (Ala.Cr.App. 1985) (quoting Alabama Power Co. v.Berry, 222 Ala. 20, 23, 130 So. 541, 543 (1930)).
In the present case, it is clear that the prosecutor hadno evidence with which to prove any other acts of sexual misconduct on the part of Gillespie. The above-quoted question posed to R.G. was very ambiguous. It was obviously interpreted by both defense counsel and the trial judge as relating to a complaint made on behalf of R.G.'s minor daughter, not a complaint made by R.G. herself. The prosecutor, however, statedbefore the jury that it related to a complaint made by R.G. herself and repeatedly propounded questions which implied that R.G. had made such a complaint. Aside from this ambiguous question, the record is absolutely devoid of any evidence which supports a contention that R.G. ever made an allegation that her father had engaged in any type of sexual misconduct withher. In fact, as noted above, the record indicated that the prosecution did not have any evidence that Gillespie had committed other acts of sexual misconduct. In spite of this, the prosecutor continually asked questions and made comments suggesting and implying that Gillespie had committed such acts.
We are of the opinion that the cumulative effect of the repeated questions and insinuations by the prosecutor created in the minds of the jurors the impression that Gillespie had engaged in other acts of sexual misconduct. As stated by our supreme court in Blue v. State, 246 Ala. 73, 79-80,19 So.2d 11, 16-17 (1944):
 "[W]e do not think that each of the above statements [by the prosecutor] must be analyzed separately to see whether or not, standing alone, it would create an ineradicable bias or prejudice. We think, on the contrary, that these various statements should be considered together to determine whether or not, in their cumulative effect, they created a prejudicial atmosphere. . . . [I]t is our duty to see to it that trials are free from prejudice and passion and that the courtroom means that where a conviction is obtained, it is obtained in an impartial atmosphere. The foregoing remarks were made in the presence of the jury. Considering them in their cumulative effect, we think they were calculated to inject the poison of bias and prejudice into the minds of the jury. They created an atmosphere of bias and prejudice which no remarks by the court could eradicate."
See also Jetton v. State, 435 So.2d 167, 172 (Ala.Cr.App. 1983); White v. State, 376 So.2d 1129, 1130-31 (Ala.Cr.App.), cert. denied, 376 So.2d 1132 (Ala. 1979); Bezotte v. State, supra. *Page 645 
Furthermore, the trial judge did very little to curb the prosecutor in this regard and even exacerbated the situation by stating, at least twice in the presence of the jury, that it was for the jury to remember the evidence in the case. Despite his assertions during the in-chambers hearing that he would "explain it to the jury" and that he could "take care of it," the trial judge did not at any time specifically instruct the jury to disregard the insinuations of the district attorney. Although he did, in both the instructions given to the jury before the presentation of any evidence and at the close of all evidence, instruct the jury that the questions posed by lawyers were not evidence, we do not find this to be sufficient to eradicate the impression created in the minds of the jurors by the questions and insinuations injected by the prosecutor. Cf.Ex parte Stubbs, 522 So.2d 322 (Ala. 1987) (adopting the dissenting opinion of Patterson, J., in Stubbs v. State,522 So.2d 317, 322 (Ala.Cr.App. 1987), that prosecutor's statement in closing argument was improper where not supported by the evidence and trial court's apparently contemporaneous instructions that statements by attorneys were not evidence was insufficient to eradicate the impression caused by the improper statement). See also Allen v. State, supra.
More importantly, "[o]n the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative value is to show his bad character, inclination, or propensity to commit the type of crime for which he is being tried." C. Gamble, McElroy's Alabama Evidence, § 69.01(1) (3d ed. 1977). We, of course, recognize that "certain 'other purpose' exceptions to this rule of exclusion exist, such as the accused's motive, intent, identity, or common plan, design, or scheme, or system, in regard to all of which evidence [of collateral offenses] may be introduced provided there is a real and open issue as to one or more of those 'other purposes.' "Bowden v. State, 538 So.2d 1226, 1227 (Ala. 1988); Staten v.State, 547 So.2d 607 (Ala. 1989). See generally McElroy's, § 69.01. Because Gillespie contended that the charged acts of misconduct never occurred, "there was no 'real and open issue' concerning identity." Anonymous v. State, 507 So.2d 972, 975
(Ala. 1987). Similarly, there was no "real and open issue about his intent," as the intent necessary for a conviction of first degree sexual abuse "may be inferred by the jury from the act itself." Ex parte Cofer, 440 So.2d 1121, 1124 (Ala. 1983). It is also clear that none of the other exceptions applies in the present case. The only conceivable purpose for the questions and insinuations on the part of the prosecutor was to "prejudice the accused by suggesting that he was more likely to be guilty of the crime[s] in question." Allen v. State,478 So.2d 326, 330 (Ala.Cr.App. 1985).
The state argues on appeal that "since the prosecutor's attempt to get the evidence admitted was futile, there was no testimony of collateral misconduct or 'other crimes' before the jury." (Appellee's brief at 12.) Although the prosecutor did not openly present evidence of "other crimes" (apparently because he had none), the cumulative effect of his repeated questions and insinuations was such that the jury could have readily inferred that Gillespie had engaged in other unspecified acts of sexual misconduct. In a similar case,United States v. Shelton, 628 F.2d 54, 57 (D.C. Cir. 1980), the prosecutor, through innuendo, implied that the defendant and a defense witness were "members of the drug underworld involved in all sorts of skulduggery." In reversing the conviction, the court stated:
 "The evidence produced by the prosecutor's line of cross-examination is not rendered more acceptable by the fact that it is less focused and more subtly adduced than traditional 'other crimes' evidence. Quite the contrary. Where the 'other crime' alleged is not specified, it is more difficult for the defendant to refute the charge or to demonstrate its insignificance. Where the evidence is presented by innuendo, it is less likely that the jury will guard against manipulation. Therefore, the likelihood that a jury will draw an improper inference is even *Page 646 greater in a case like the one before us than it is in the traditional 'other crimes' case." 628 F.2d at 57 (emphasis added).
The issue in this case was very simple: either Gillespie committed the charged acts of sexual abuse or he did not. The evidence on this issue was in sharp conflict, with the victims asserting that the acts occurred and Gillespie maintaining that they did not. Instead of concentrating on that issue, the prosecutor sought to bolster his case by prejudicial attacks upon Gillespie which were not only completely unsupported by any evidence, but also concerned matters which were totally inadmissible. Our review of the entire record convinces this Court that the prosecutor's questions implying collateral and other acts of sexual misconduct were calculated and deliberate despite the trial judge's rulings. "He tried to convey to the jury, by insinuation, suggestion, and speculation, that [Gillespie] may have committed . . . offenses similar to the one for which he was being tried. These prejudicial attacks upon [Gillespie] . . . deprived [him] of a fair trial."People v. Chin, 525 N.Y.S.2d 673, 675, 138 A.D.2d 389 (1988).Cf. People v. Hudson, 179 Cal.Rptr. 95, 96, 126 Cal.App.3d 733,735 (1981) (conviction of sexual offenses reversed where the evidence was in sharp dispute and the deputy district attorney "resorted to inflammatory rhetoric, violated the trial court's rulings, brought out inadmissible matters in the guise of questions and statements, used extremely vulgar forms of argumentative questions and injected prejudicial innuendo by his editorial comments in front of the jury"); Hosford v.State, 525 So.2d 789 (Miss. 1988) (in child molestation case where the evidence was in conflict, it was reversible error for the prosecutor to question the defendant regarding unrelated perverted acts with the defendant's stepchildren for which there was no evidentiary basis). See also Jenkins v. State,472 So.2d 1128, 1129-30 (Ala.Cr.App. 1985), wherein this Court noted the prejudice associated with the joinder of sex crimes for trial.
 II
During the prosecutor's cross-examination of Gillespie, defense counsel requested a hearing outside the presence of the jury when the prosecutor began questioning Gillespie about his brother. In this hearing, the prosecutor indicated that he intended to ask Gillespie whether Gillespie and his brother were members of the Ku Klux Klan. Defense counsel objected, stating that the brother had "been convicted of sexual abuse several times," and, as there were nine black jurors, the question would serve only to prejudice Gillespie. The trial court overruled the objection on the basis that defense counsel went into Gillespie's background, such as his marital status, military service, and work experience, during direct examination. However, he also observed: "Well, that [the Ku Klux Klan] doesn't have much to do with sexually molesting the kids. . . ." During this same hearing, the trial court instructed the prosecutor to refrain from asking Gillespie any questions concerning his past or present religious affiliation. When cross-examination was resumed, the following occurred:
 "Q. [By the prosecutor]: Buddy Gillespie is your brother isn't he?
"A. Yes, sir.
 "Q. You and he are both members of the Ku Klux Klan aren't you?
 "A. No, sir, absolutely not, not one day. I have never been to a — never — the only thing I know is what I hear my brother say. I don't know that for a fact.
"Q. And that's a secret organization isn't it?
 "A. Sir, I don't even know that my brother belongs to it. If you can show me that my brother belongs to it, — I don't even know that he belongs to it.
"Q. Members don't admit they are members, do they?
 "A. If my brother was a member, he would be more than glad to tell you so.
"Q. All right.
"A. Would you like to call him, sir?
"Q. We have."
This court fails to see any distinction between questions regarding Gillespie's religious affiliation, or lack thereof, which *Page 647 
the trial court correctly prohibited, and questions regarding alleged membership in the Ku Klux Klan, which the trial court permitted. The same rule applies to both:
 " 'We have never understood, unless the affairs of a fraternal, religious, or political society, or of an organization, are involved in issue, that it is competent to show a witness has a membership in such organization.' "
Russell v. State, 27 Ala. App. 10, 13, 165 So. 256, 258 (1935) (emphasis added). See also McElroy's § 141.01(5).
We have recognized that the Ku Klux Klan is an organization "which espouses white supremacy and racial hatred,"Chambliss v. State, 373 So.2d 1185, 1207 (Ala.Cr.App.), cert. denied, 373 So.2d 1211 (Ala. 1979). We have held that evidence of the defendant's membership in this organization is admissible for the purpose of showing his motive for "bombing a church whose members were predominantly black," id. However, the present case involved sexual offenses against children and the prosecutor's questions regarding this organization clearly served no purpose other than to prejudice Gillespie. Cf. Statev. Koch, 321 Mo. 352, 10 S.W.2d 928, 931 (1928) (in arson case, conclusory opinion of prosecution witness that the defendant was a member of the Ku Klux Klan, "without further proof that defendant, by reason of membership in the Klan, bore enmity to the injured, so as to show motive," was prejudicial error requiring reversal).
Whether or not Gillespie was a member of the Ku Klux Klan had absolutely no probative value in this case. Although the trial judge, who happens to be black stated, "it doesn't offend me one bit that he is a member of the Klan," there were nine blacks on the jury and the potential for prejudice was overwhelming. The Klan is synonymous with racial bigotry and hatred and with violence, harassment, and intimidation. However, even if we accept the trial court's reasoning and the state's argument that Gillespie "opened the door" to these questions by his testimony on direct examination as to his background, the prosecutor was still bound by the precept discussed in Part I above: It is improper for the prosecutor to ask questions which intimate facts which he cannot support by evidence. Daniel v. State; Young v. State; Bezotte v. State, supra. Where the prosecutor insinuates the existence of a fact which the witness denies, the prosecution "may have a duty to complete its impeachment of the witness or show that the prosecutor had 'evidence of or reasonable ground to believe the truth of its implication.' " Wysinger v. State, 448 So.2d 435,438 (Ala.Cr.App. 1983). We find this to be a case in which the prosecutor had such a duty even had KKK membership been admissible.
The evidence was in sharp dispute and the question of Gillespie's guilt turned entirely on whether the jury believed him or the victims. After Gillespie denied that he was a member of the Ku Klux Klan, the prosecutor posed several questions designed to imply that Gillespie was lying about the matter. However, the prosecutor did not call Gillespie's brother (who, he had insinuated, had informed him that Gillespie was a member) or offer any other evidence to show that Gillespie was, in fact, a member of the Ku Klux Klan. By insinuating that Gillespie was a member of the KKK, and that Gillespie was lying when he denied membership in this organization, without offering any proof to support these insinuations, the prosecutor improperly undermined Gillespie's credibility.Cf. Lee Won Sing v. United States, 94 U.S.App.D.C. 310,215 F.2d 680 (1954) (where the chief defense witness stated that he committed the crime and was pleading guilty to the offense, his credibility was of great importance and the prosecutor's question asserting that the witness was pleading guilty because the defendant was paying him $20,000 was prejudicial error requiring reversal inasmuch as the prosecutor offered no evidence to refute the witness's negative response); People v.Hudson, 179 Cal.Rtpr. at 99, 126 Cal.App.3d at 741 ("The question of appellant's guilt depended greatly on the jury's determination of the relative credibility of the witnesses. The evidence is in sharp conflict. . . . The highly prejudicial implications arising from *Page 648 
the improper questions asked of appellant on cross-examination impaired his credibility and presented him as a person of criminal tendencies"). See also Daniel v. State, supra (conviction of sexual abuse reversed where defendant denied prosecutor's assertion that defendant had a third party offer the mother of the victim money in exchange for dropping the charges and the prosecutor had no "lawful evidence" to prove the assertion).
The crimes for which Gillespie was indicted and tried are reprehensible. However, a charge of even the most heinous crime imaginable does not grant the prosecution the right to engage in unprofessional and improper trial tactics calculated to prejudice the jury against the defendant. "[I]n seeking to prove a defendant's guilt, a prosecutor has an obligation to insure that the defendant receives a fair trial and . . . he must restrain misguided impulses and excessive zeal during cross examination and summation." People v. Higgins, 450 N.Y.S.2d 558, 88 A.D.2d 921 (1982). Additionally, "[t]he prosecutor must refrain from injecting unfounded or prejudicial innuendo into the proceedings, People v. George, 130 Mich. App. 174, 342 N.W.2d 908 (1983). . . ." State v. Blaine,427 N.W.2d 113, 115 (S.D. 1988). While we recognize that a " 'trial is a legal battle, a combat in a sense, and not a parlor social affair,' " Blue v. State, 246 Ala. at 80, 19 So.2d at 16, conduct such as that exhibited by the prosecutor in the present case far exceeds the bounds of fair play and aggressive but legitimate prosecution. Such conduct will not be tolerated by this Court.
Because of the prosecutor's improper conduct, the judgment of the Montgomery Circuit Court is reversed and this cause remanded for further proceedings.
REVERSED AND REMANDED.
All Judges concur.
[1] Because Gillespie's motion for judgment of acquittal was granted with regard to the charges involving the third alleged victim, we deem it unnecessary to discuss the specific facts of the two cases involving that person.
[2] The state was represented by two assistant district attorneys. The conduct complained of was engaged in exclusively by only one prosecutor. *Page 968